CHARLES G. KLOTZ v. WINONA & ST. PETER RAILROAD COMPANY.[1]

May 26, 1897.

Nos. 10,364—(66).

68    341
52LRA 352
68    341
82    169

### Accident at Railroad Crossing—Right to Use of Crossing as Highway.

Although a railway company possesses the right to the use of its track across a public highway, the public still retains its right to use such crossing as a highway, and in the proper use thereof the traveler is not a trespasser.

### Same—Negligent Use of Crossing by Company.

When a railroad car and engine are being pushed backward over a highway crossing, extra precautions should be used by the railroad company to avoid injury to travelers lawfully upon the track; and this rule is especially applicable where the crossing is so used infrequently, at irregular times, as a sidetrack for switching purposes.

### Same—Degree of Care.

As a general rule, a railroad company is required to take greater precautions at a dangerous crossing in a city than at the ordinary highway crossing in the open country.

### Same—Question of Negligence for Jury.

*Held*, upon the facts in the case it was a question for the jury whether the railroad company was guilty of negligence in operating its cars over the public highway crossing in the manner it did at the time of the accident, and also whether the plaintiff's intestate was then guilty of contributory negligence.

Appeal by defendant from an order of the district court for Brown county, Webber, J., denying a new trial after a verdict for plaintiff for $800. Affirmed.

*Brown & Abbott*, for appellant.

On the question of contributory negligence cited Donaldson v. Milwaukee, 21 Minn. 293; Brown v. Milwaukee, 22 Minn. 165; Smith v. Minneapolis, 26 Minn. 419; Abbett v. Chicago, 30 Minn. 482; Rogstad v. St. Paul, 31 Minn. 208; Marty v. Chicago, 38 Minn. 108; Carney v. Chicago, 46 Minn. 220; Johnson v. Truesdale, 46 Minn. 345; Clark v. Northern, 47 Minn. 380; Studley v. St. Paul, 48 Minn. 249; Miller v. Truesdale, 56 Minn. 274; Magner v. Truesdale, 53 Minn. 436;

[1] Reported in 71 N. W. 257.

Schlimgen v. Chicago, 90 Wis. 186; Braudy v. Detroit, 107 Mich. 100; Duvall v. Michigan, 104 Mich. 386; Gardner v. Detroit, 97 Mich. 240; Elliot v. Chicago, 5 Dak. 523; Romeo v. Boston, 87 Me. 540; Gangawer v. Philadelphia, 168 Pa. St. 265; Derk v. Northern, 164 Pa. St. 243; Moore v. Keokuk, 89 Iowa, 223; Shirk v. Wabash, 14 Ind. App. 126; Louisville v. Stephens, 13 Ind. App. 145; Texas v. Brown, 2 Tex. Civ. App. 281; Louisville v. Hairston, 97 Ala. 351; Montgomery v. Alabama, 97 Ala. 305; Louisville v. Richards, 100 Ala. 365; Matthews v. Atlantic, 117 N. C. 640; Missouri v. Moseley, 57 Fed. 921. Omission to provide a flagman at a crossing and to ring the engine bell when approaching it do not constitute negligence as against a person who is walking along the track, since such precautions are for the sole benefit of those about to cross the track. Chicago v. Eininger, 114 Ill. 79; Roden v. Chicago, 133 Ill. 72; Pennsylvania v. Mooney, 126 Pa. St. 244; Kelly v. Michigan, 65 Mich. 187; Glass v. Memphis, 94 Ala. 581; Grethen v. Chicago, 22 Fed. 609; Magner v. Truesdale, supra.

*John Lind,* for respondent.

BUCK, J. Klotz, as administrator of the estate of Christian Hocker, brought this suit to recover damages for injuries inflicted by the act of the defendant resulting in the death of Hocker. The accident happened on Center street, in the city of New Ulm. This street is 120 feet wide, and is one of the principal traveled thoroughfares in said city, which contains a population of about 5,000 people. The defendant, a railway corporation, has for many years last past owned and operated its line of railway from the city of Winona westward through said city of New. Ulm, crossing said Center street in close proximity to the City Planing Mill. Center street extends northerly and southerly from this crossing of the main line quite a long distance. Commencing at the main line on the west side of Center street, and extending northerly several blocks, is a sidewalk 12 feet wide. On the east side of the street, and coming from the south beyond the railroad tracks, is a sidewalk which intersects and crosses all of the railroad tracks, but on the northerly side of the Eagle Mill sidetrack it extends northerly only a short distance on the easterly side of Center street. Three of defendant's tracks cross Center street. The

Eagle Mill track is north of the main line, which it leaves about 270 feet east of Center street, and, running across it, extends to Eagle Mill, a distance of more than 500 feet, curving to the northward after leaving the main line; and is upon a down grade from such intersection until it crosses Center street, where the track is quite level for at least 200 feet. This is the track upon which the plaintiff was injured.

On the east side of Center street the track is about 54 feet north of the main line, and on the west side of said street it is about 82 feet north of said line. The City Mill side track intersects with the main line about 60 feet east of Center street, which it crosses some 10 to 20 feet south of the main line, and extends to the City Mill, which is situated near the westerly boundary of Center street. Some 300 feet east of Center street, and about 50 feet south of the main line, is the Empire Mill. While it appears that it is a down grade on the Eagle Mill track from the junction with the main line to the place where Hocker was injured, it is impossible to tell, from the confused state of the record, just what that grade is, on account of the difference in the lettering in the paper book from that on the plat admitted in evidence.

The engine was backed down with tender attached, and the engine did not use any steam, the engine running from its own momentum at the time of the accident. One of the defendant's witnesses testified that the engine would run rapidly from its own momentum. There was somewhat of a conflict in the evidence as to the rate of speed the engine was actually moving. Some of the witnesses testified it was running fast; others that it was only running five or six miles per hour. The engineer testified that he could stop the engine, when running by steam, at 50 feet, on a level track, after he applied the emergency brake, when the engine was running five or six miles per hour. This engine was stopped on a level track, at about 160 feet from where the accident occurred. It ran about 100 feet after the signal was given to stop.

When the engine was running without steam, it made no noise except the rumbling of the wheels, as there is then no noise from the exhaust of the steam. In backing down, the engineer could not see any object upon the track nearer the tender than about 100 feet from

it. The engine used at the time of the accident was a road engine, and not one usually used in switching. It appeared from the testimony of an experienced railroad man that it was the universal custom, in using switch engines, to have one with a footboard on the same, with a man stationed thereon as a lookout, to warn and protect switchmen or anybody else who should get on the track, and also to signal the engineer of the danger. There was no footboard on this engine, and no one stationed upon it to warn persons of danger, or to signal the engineer. The bell, however, was rung as the engine moved along the track from its junction with the main line to the place where Hocker was injured.

In the morning of May 7, 1895, about one-half hour before the accident, Hocker, who was a man 72 years old, went to the City Mill to get some chicken feed, having with him a wheelbarrow on which to carry it. He was unable to get the feed at the City Mill, and he then went over to the Empire Mill, where he also failed to get the feed; and then he returned to Center street, keeping south of the railroad tracks until he got to Center street, evidently, as it seems to be conceded, on his way to the Eagle Mill, to get the desired chicken feed. To do this, he crossed the City Mill side track and the main line and part of the Center street to the railroad crossing in question. There were two routes frequently traveled in crossing Center street from the east sidewalk to the west one in the direction of the Eagle Mill. One route for foot travel was from the junction of the east sidewalk with the main line, northwesterly to a point on the Eagle Mill side track a short distance east of the west sidewalk; and the other one, starting from the same point, traveling north on the east sidewalk to the Eagle Mill side track, and then crossing Center street on this side track. The reason for this appears to be that the west sidewalk, at its junction with the Eagle Mill side track, was built upon a trestle some three feet high, and, as the side track was built upon the same grade as the west sidewalk, it facilitated the passage across the sidewalk; it being difficult to get upon it on either side of the side track.

Immediately preceding the accident, Hocker was seen upon the Eagle Mill side track, several feet from the east of the west sidewalk, going westerly, with his wheelbarrow; and to aid in handling it he

had a rope passed over his shoulders, and fastened to the handles of the wheelbarrow. While going in this position, the rope over his shoulders was struck by the tender, and Hocker was thrown down, the wheelbarrow broken into many pieces, and from the injuries which he then received Hocker shortly died. A short time before the accident the engine in question was moved from the City Mill, where it had been switching cars, along the City Mill spur, easterly, over the switch onto the main line and past the switch, where it was stopped until the switch was turned onto the Eagle Mill side track, when it backed westerly on that side track, and then moved to the place where the accident occurred. It is to be observed that this engine moved eastward from the City Mill near the route which Hocker took in going from the City Mill to the Empire Mill and then back to Center street, and near where he crossed the City Mill spur track and the main line on his way to the point where he was injured, and while he was going to Eagle Mill as was his custom to do.

Before going onto the switch from the main line, the engineer was blowing the whistle, but not doing so on the Eagle Mill side track at the time of the accident. There was no watchman at any point on the crossing, and the city mill was running and making considerable noise, and is situated about 120 feet from the place of the accident. There was no lookout on the tender or engine. When the engine and tender were being backed, the domes and the whistle were between the front of the tender and the bell. The trains on the Eagle Mill side track averaged about three per day, not running on regular time, so far as we can discover from the record. There were no obstructions at any point from the route traveled by the deceased so as to intercept his view of the movements of the engine from the time it left the City Mill up to the time of the accident, and none to intercept the view of the engineer of Hocker on the route which he traveled prior to the time of the accident, except such as arose from his position on the engine.

All of these facts in the case might reasonably suggest to the jury, and sufficiently so, in warranting them in finding that Hocker crossed Center street at or about the same time that the engine was moving eastward across the same street on the City Mill spur track, or being switched from the main line to the Eagle Mill side track; and that

the deceased might have been misled or thrown off his guard by the whistling and other noise of the engine when thus moving away from him eastward towards the switch. All of this, together with the continued noise from the running of the City Mill, near by, and the position of the bell on the engine with reference to its not plainly conveying the sound to him while he was going to or upon the Eagle Mill side track, constituted questions peculiarly for the jury. Added to this, the fact that no lookout was placed upon the tender or switch engine, contrary to what a witness, who was an experienced railroad man, testified was the universal custom in such cases, to warn him of danger, made such a case upon the question of defendant's negligence and plaintiff's contributory negligence that we do not feel at liberty to disturb the verdict upon the question of facts.

The suggestion of counsel for the defendant that the deceased was familiar with the railroad track and their crossings at Center street, and that from any point upon the route which he traveled he had an unobstructed view of the movement of the engine, and should have heeded its warnings and dangers, and that when approaching on the Eagle Mill track he should have looked and listened for the coming engine and tender, is not without force, and, if there were no intervening causes and surrounding circumstances which deceived and misled him, and thus excused his otherwise contributory negligence, the objection would be fatal to the plaintiff's recovery. It is the settled law of this court that where one is approaching and about to cross at a public highway railroad crossing, ordinary prudence requires him to use his senses, his hearing and his sight, in ascertaining whether he may cross in safety. Rogstad v. St. Paul, 31 Minn. 208, 17 N. W. 287; Magner v. Truesdale, 53 Minn. 436, 55 N. W. 607.

But the facts in this case are radically different from those in the cases cited, or those of any other to which we have been referred. The mere fact that there was an unobstructed view between the position of the deceased and the defendant's engine is like a two-edged sword, which cuts both ways. If Hocker could see the defendant's moving engine, why could not the engineer see Hocker? So far as concerns negligence of the parties, their obligations were correlative, even if the defendant had the prior right of way over the Eagle Mill side track. However exclusive may be the property of a railroad

right of way, upon which a stranger has no right to be, the rule is different at a public highway crossing. The railroad company possess the right to the use of the track over the highway crossing, but the public retains its right to the use of the crossing as a highway, and in such proper use the traveler is no longer a trespasser; and in the use of such crossing each party must exercise due care and diligence in regard to their respective duties, and must also exercise reasonable care to prevent injury to the other. In this case the question doubtless suggested itself to the jury, as it does to us, why the employes of defendant did not see this old man, with a rope over his shoulders attached to the handles of a wheelbarrow, which he was pushing along towards defendant's railroad track, or upon it, in time to have avoided the injury which resulted in his death. That he traveled over a route on Center street to the place of the injury at all times plainly visible to defendant's employes is certain, as much so as the fact that he could during such time have seen the engine going from or coming towards him. Perhaps we should qualify this statement by saying that in backing the engine and tender the engineer could only see the track, or an object upon it, about 100 feet beyond the end of the tender furthest from him. But whose fault was this? It was in evidence in the case for the consideration of the jury that it was the universal custom to have footboards on switch engines to protect railroad employes and other persons upon the track from approaching danger. In Cooper v. Lake, 66 Mich. 261, 33 N. W. 306, it was held to be gross negligence to back a train without a brakeman at the rear end as a lookout, across the main thoroughfare of a village, where there is no flagman at the crossing, even at a rate little faster than a walk. In the case cited the bell was ringing when the accident occurred.

Lawson, in his work on Rights, Remedies, and Practice at Law, volume 3, § 1187, lays down the rule that "when the train is backing, or cars are being pushed by a locomotive, extra precautions must be used to avoid injuries at crossings," and he cited in support of this proposition several authorities. And he asserts the further doctrine, in the same section, that the ringing of the bell or sounding the whistle on the locomotive is not sufficient. We cite these authorities as showing to what extent some eminent courts have gone in holding

railroad companies to a great degree of diligence and care in running engines and cars backward over highway crossings in populous cities or villages. In Elliott on Railroads, volume 3, § 1162, he states that there are many cases in which but one reasonable inference can be drawn, and the court can say as a matter of law that it is negligence to back a train over a crossing where people are likely to be in a populous city, without warning or other precautions; but he thinks it going too far to say that backing cars is negligence per se under any and all circumstances, and that it is not negligence if proper precautions are taken; and whether such precautions have been taken by the company, and it has used reasonable care under the circumstances, is generally a question of fact for the jury. Whichever rule we adopt in this case, the defendant is liable, unless the negligence of the deceased contributed to the injury, which will be referred to later on in this opinion.

Nor can it be reasonably said that it was not the duty of the company to keep a lookout upon the tender or engine in backing them over a thoroughfare like Center street in New Ulm. If there was no duty imposed upon it by law to keep watchmen or flagmen at this crossing, and if it was not negligent in not doing so, yet this fact cast upon defendant additional care in operating its engine and tender, and in taking greater precautions in moving them across this street so as to prevent accidents. If the train was running slowly, as claimed by the defendant, any employe standing upon a footboard could easily have rescued the old man without having the brakes applied at all. He could easily have discovered him upon the track in time, before the tender or engine reached him, to have warned him of the approaching danger, or leaped from the footboard, and pulled him from the track. On the other hand, if the engine was running rapidly across a thoroughfare, without a lookout, it was its duty to take reasonable precautions against injuring persons lawfully upon the track. In such case "the measure of precaution which prudence suggests is in due proportion to the probability of danger." But that, in this case, was a fact to be determined by the jury, in view of all of the attending circumstances.

The evidence furnished something more than mere food for speculation. There were ample facts and circumstances for it to draw

reasonable inferences that the defendant was guilty of negligence, and that there was not any contributory negligence on the part of the deceased. We may concede as a rule of law that a side track, as well as the main line, is of itself a warning of danger, but, as such danger is as well known to the company as to the traveler, there may be instances where more than the usual ordinary care is required. As a general thing, the company is required to take greater precautions at a dangerous crossing in a city, than at the ordinary crossing in the open country. 3 Eliott, Railroads, § 1161. More than 100 teams and a large number of people passed over this crossing daily, and when a railroad company makes a thoroughfare like this a part of its switch yard it should exercise precautions not demanded in ordinary cases, and more efficient in saving human life than appears in the case at bar.

We now come to the question of the contributory negligence of the deceased. Negligence on the part of the defendant's employes would not relieve the deceased from the duty which the law imposed upon him. He should observe due care and watchfulness, and not rely entirely upon the acts of others, but this due care depends very frequently upon the facts of the particular case. It cannot be said that in all cases, as a matter of law, it is the duty of the traveler to stop and look and listen for the approaching train. The case at bar, we think, is one where the surroundings were of such a character that made the question one of fact, rather than of law. There was the rumbling noise of the City Mill near by, the moving of the engine eastward from where plaintiff was traveling, with its noise and blowing of its whistle, which might have operated to throw plaintiff off his guard. By reason of so much noise from different sources, and especially from the engine, which he could see moving away from him, he might have been deceived and misled. This rule as to noise has been applied where there was the sound of falling water at a crossing. Richardson v. New York, 45 N. Y. 847. Also where the noise was caused by a wagon, and by a steam sawmill, and by another train. Leonard v. New York, 42 N. Y. Super. Ct. 225. See, also, Hendrickson v. Great Northern, 49 Minn. 245, 51 N. W. 1044.

Nor can it be said that the deceased was intentionally guilty of negligence, or reckless in his conduct. The moment he discovered the

tender near him, he made an effort to get out of its way, but was impeded by the wheelbarrow and the rope around his neck, and attached to it, whereby he was jerked down by the tender and injured. The love of life is also too strong to permit us to indulge in any presumption that he acted recklessly, or that he did not do what a prudent man ordinarily would do to save his life. The railroad tracks were nearly parallel, not far apart, the engine passing over them only about three times a day, and he may have been led to believe that the engine was continuing its eastward course away from him. The position of the ringing bell as the engine approached the crossing may have tended to force very much of its sound away from him. All of these matters, in connection with the omission of the defendant to have a footboard or other contrivance on the engine or tender to carry a lookout, the rate of speed of the engine, and its moving backward, all tend to rebut the charge of contributory negligence on the part of the deceased. A traveler approaching a railroad crossing has a right to presume that in handling its cars the railroad company will act with a proper care, and that the signals of approach will be seasonably given. 3 Lawson, Rights, Rem. & Pr. § 1189, and cases there cited. It is the settled law of this state that contributory negligence is a matter of defense, and the plaintiff, in making out his case, need not prove the absence of it. And where there is any controversy as to the fact, and different conclusions might be drawn by fair-minded men, the question of contributory negligence is one for the jury acting under proper instructions from the court.

The next question arises upon the assignment of error that the court erred in its admission of the resolution of the city council of the city of New Ulm ordering and directing the defendant to post and maintain a competent flagman at the crossing of Center street, upon the ground that said resolution had not been pleaded, and that it had not been published as required by the charter of said city. A resolution of the character of the one in question need not be pleaded. Faber v. St. Paul, 29 Minn. 465, 13 N. W. 902. When the plaintiff offered the resolution in evidence, the only objections made by defendant were that it was incompetent, irrelevant, and immaterial, and not admissible under the pleadings. The decision just quoted disposes of the last ground of the objections.

It is evident that the defendant's counsel, in raising the other grounds of objection, did not have in mind or intend that such grounds should apply or reach the question that the resolution had not been published. If counsel desired to exclude the evidence upon that ground, he should have made the objection specific upon that point, so as to have called the attention of the court and opposite counsel to it, and thus have enabled said counsel to have supplied the proof, or, if the proof of publication was not supplied, to have enabled the court to have sustained the objection. The objection should be sufficiently definite to enable the court to understand and rule upon it, and permit the opposite party to remove the objections, if possible. King v. Nichols, 53 Minn. 453, 55 N. W. 604; Union v. John, 49 Minn. 481, 52 N. W. 48. This rule applies also to the motion to strike out the record of the city council relative to the resolution. Nowhere did defendant's counsel make the specific objection that the resolution was inadmissible because not published, nor include any such grounds in his motion to strike out.

All assignments of error have been duly considered, and we find no grounds in either of them for reversing the ruling of the trial court, and hence the order denying the defendant's motion for a new trial and judgment is affirmed.

MITCHELL, J. Owing to the peculiar condition of the record, I have entertained some doubt upon the last point considered in the opinion of the court, but have concluded that the record does not affirmatively show any error. Irrespective of any statute changing the rule, the burden is on the party introducing in evidence a by-law or ordinance of a city to prove the existence of everything necessary to the enactment of a valid by-law or ordinance, that is, its due passage and publication, where the latter is a condition precedent to its taking effect. But the general statutes provide that

"whenever the by-laws, ordinances, rules and regulations of any city * * * have been or shall hereafter be printed and published by authority of the corporation, the same shall be received in evidence in all courts and places without further proof." G. S. 1894, § 5719.

Section 12 of chapter 4 of the Charter of New Ulm, Sp. Laws 1887, c. 4, contains a similar, or even broader, provision. The by-law or or-

dinance in this case was proved by introducing in evidence a book in the custody of the city clerk, called "Records of the City Council," and which contained the by-law or resolution in question. This is absolutely all that the record contains as to the nature of this book. Counsel on both sides seem to have been groping somewhat in the dark when this evidence was offered on the trial, and we may, perhaps, surmise that plaintiff's counsel was resorting to the common law, and not to the statutory method of proving the resolution, but I do not think it sufficiently appears that the book offered in evidence was not such a one as, under the statute, is made evidence, without further proof, of the due passage and publication of a by-law or resolution. I therefore concur in the result.

CANTY, J. I concur in the result on the ground that the evidence warranted the jury in finding that defendant was guilty of negligence; and as to decedent's contributory negligence in failing to look before he attempted to cross the Eagle Mill spur track, where he was injured, I concur on the ground that it is not, as a question of law, negligence to fail to look or listen before attempting to cross such a spur track, leading to a private industry, and used only two or three times a day by a switching train which runs slowly, such track being used only for the purpose of making connections with such private industry; that it was a question of fact for the jury whether or not plaintiff's intestate was guilty of negligence in failing to look and listen before attempting to cross this spur track. On the point referred to by Mr. Justice MITCHELL, I concur with him.