CHARLES WOEHRLE v. MINNESOTA TRANSFER RAILWAY
COMPANY.[1]

January 4, 1901.

Nos. 12,293—(166).

## Railway Crossing—Duty to Look and Listen.

The rule that it is the duty of a traveler on the highway, about to go upon a railway crossing, to look and listen, to the extent of his opportunity, for an approaching train, is not always an absolute one. While he cannot omit to exercise due care in so looking and listening, in reliance upon the railway company doing its duty as to giving signals, yet under special circumstances he may regulate his own conduct in some degree with reference to the presumption that it will do its duty.

## Reliance on Flagman.

Where it is the custom of a railway company to keep gates or a flagman at a dangerous crossing, the raised gates or the absence of the flagman, to a traveler to whom the custom is known, is an assurance of safety, and an implied invitation to make the crossing, upon which he may to some extent, but not entirely, rely and act, within reasonable limitations, upon the presumption that it is safe for him to go upon the crossing. The extent to which he may rely on such assurance is a question of fact, unless it conclusively appears that he relied exclusively thereon.

## Contributory Negligence.

Rules applied, and *held* that the question of the plaintiff's contributory negligence was one of fact, and that the trial court erred in not submitting it to the jury.

Action in the district court for Hennepin county to recover $20,000 damages for personal injuries. The case was tried before McGee, J., who directed a verdict in favor of defendant. From an order denying a motion for a new trial, plaintiff appealed. Reversed.

*F. N. Hendrix* and *L. J. Van Fossen,* for appellant.

*W. H. Norris* and *F. W. Root,* for respondent.

START, C. J.

The plaintiff, on January 10, 1900, while crossing the railway

[1] Reported in 84 N. W. 791.

track of the defendant on a public highway in the town of Rose, this state, was injured by his wagon being struck by a passing engine, with car attached. This action was brought to recover the damages the plaintiff sustained by reason of such injuries, and at the close of the evidence the court, on motion of the defendant, instructed the jury to return a verdict for the defendant, and the plaintiff appealed from an order denying his motion for a new trial.

The alleged negligence on the part of the defendant consisted in driving its engine across the highway without giving any signal of its approach, and in failing to have a flagman stationed at the crossing to warn travelers on the highway of the approach of the engine. It is here conceded that the evidence was sufficient to take the case to the jury on the question of the defendant's negligence, but it is urged that the trial court correctly directed a verdict on the ground that the plaintiff was guilty of contributory negligence. Does the uncontradicted evidence conclusively show, as a matter of law, that the plaintiff was guilty of negligence which contributed directly to his injury? This question is to be determined by an attentive consideration of the special facts which the evidence tends to establish, and in so doing we must, if there is any fair doubt as to what the evidence tends to prove, or as to the inferences to be drawn from the admitted facts, accept that view of them which is most favorable to the plaintiff. Whatever facts the evidence on the part of the plaintiff tends to show must, for the purpose of this appeal, be assumed as the facts in this case, although the weight of the evidence may be to the contrary. Upon this hypothesis, the here material facts of this case are these:

The defendant's railway at the locus in quo runs approximately north and south. From the point where the railway and the highway intersect, the former extends for one thousand feet through a cut, which one hundred fifty feet north of the crossing is thirteen feet deep. The highway at the crossing runs at an angle with the track of the railroad, northeast and southwest, and is downhill for about forty rods. Intervening between the wagon road and the railroad all the way down the hill there are trees

and brush, and a bank of earth on the north side of the highway, near the crossing. The first point that an engine on the track, coming from the north, can be seen from the road northeast of the crossing, is at a place about five or six feet wide, one hundred fifty feet from the crossing, at which point the engine can be seen one hundred fifty feet away. The next point where the engine can be seen from the road is twenty-five feet east of the crossing, where it can be seen thirty feet up the track, and at fifteen feet from the rails it can be seen two hundred feet away. The length of the tongue and box of the wagon in which the plaintiff was riding when the collision occurred is twenty-one feet.

The crossing is a dangerous one, and so recognized by the defendant, and for years before the accident in question it had continuously kept a flagman there to warn the public of the approach of the trains. It was the custom of the flagman to be always in sight at the crossing, with a red flag in his hand, whenever an engine was approaching, but when none was coming he was always out of sight; that is, his absence was a signal of safety. The plaintiff was twenty-seven years old and in the possession of all of his faculties, had lived in the vicinity of the crossing for about nine years, and was entirely familiar with it and its surroundings; also, with the custom of the flagman to be always in sight at the crossing when a train was approaching, and to be out of sight when none was coming and it was safe for travelers to cross. It had been thawing the day before the accident, but the night before the ground froze, and the wagon road was very rough. The plaintiff was driving a span of horses hitched to a lumber wagon, with a double box and extra side boards. He drove at a walk all the way (as the road was so rough he could not do otherwise) down the hill towards the crossing, standing up in the middle of the wagon box. The wagon made more noise than usual. His testimony on this point (and he was the only person present) was this:

"Q. You had an empty wagon? A. Yes, sir. * * * Q. So that the wagon, then, on that morning, with the loose boards on top there,—side boards on top, and the box empty, and that very rough road,—would make more noise than usual? * * * A.

Yes, sir; it would, because it was rough. * * * Q. I presume you never drove over there before with your wagon making as much noise at it did at that time? A. I could not recollect it very well."

As he drove down the hill he looked, as best he could, for the approach of the train, as he was always accustomed to do when nearing a crossing, but he did not stop his team and listen before attempting to cross. He did, however, before doing so, look for the flagman, and he was not in sight; and, hearing no bell or whistle,—the wind was northeast,—he kept on his way, and when his horses were stepping over the first rail he saw the engine coming, about one hundred fifty feet away. His team was frightened, and he whipped them up, as he did not know of any other way to save himself, except to get across the track if possible. The engine was then running about eighteen miles an hour, or about three times as fast as he came down the hill, and struck the wagon about the middle of the hind wheel, breaking the wagon in pieces and throwing the plaintiff therefrom, whereby he was seriously injured. The plaintiff knew that the train usually passed the crossing at about the hour in the morning that the accident happened.

It is obvious from these facts that this case is not one where the plaintiff went upon the crossing relying implicitly upon the fact that the flagman was absent, and without looking for the approach of the engine or exercising any care in the premises. Upon the question whether the plaintiff could have seen the train in time to have avoided the accident, or whether he looked for it, the evidence was conflicting, and sufficient to warrant the submission of the question to the jury. The sole question, then, for our decision is whether, in view of the facts of this case, the plaintiff, in the exercise of ordinary care, was bound, as a matter of law, to stop his team and listen before driving upon the crossing. Are the inferences to be drawn from the facts doubtful? Is there no reasonable chance for fair-minded men to draw different conclusions from them? Unless it be clear that the last two questions must be answered in the negative, the main question must

also receive a negative answer.    Abbett v. Chicago, M. & St. P. Ry. Co., 30 Minn. 482, 16 N. W. 266.

The rule that it is the duty of a traveler on the highway, about to go upon a railway crossing, to look and listen, to the extent of his opportunity, for an approaching train, is not always an absolute one.    While he cannot omit to exercise proper diligence in so looking and listening, in reliance upon the railway company doing its duty as to giving signals, yet there are circumstances where, in regulating his own conduct, he may have some regard to the presumption that the company will do its duty.    Hendrickson v. Great Northern Ry. Co., 49 Minn. 245, 51 N. W. 1044; Newstrom v. St. Paul & D. R. Co., 61 Minn. 78, 81, 63 N. W. 253; Klotz v. Winona & St. P. R. Co., 68 Minn. 341, 71 N. W. 257; Walker v. St. Paul City Ry. Co., 81 Minn. 404, 84 N. W. 222.

Now in this case it may be conceded that if it had not been the custom of the defendant, to the knowledge of the plaintiff, always to have a flagman at the crossing when an engine was approaching, and to have him out of sight when the crossing was safe for travelers, the plaintiff would have been guilty of negligence, as a matter of law, in not stopping his team and listening before driving upon the track.    But in this case we have the fact that it was the custom of the defendant to have a flagman at the crossing when an engine was coming and the crossing was dangerous, and to have him out of sight when no engine was approaching and the crossing was safe, and, further, that the plaintiff knew of this custom, and that when he attempted to make the crossing the flagman was out of sight.    This was in effect an assertion by the defendant that the way was clear, and that the plaintiff might cross in safety.    This is so to the same extent that it would have been if, instead of a flagman, the defendant had kept gates at the crossing, which were always closed when it was dangerous, and open when it was safe, to go upon the crossing.

In such cases the raised gates or the absence of the flagman is an assurance to the traveler of safety, and an implied invitation to make the crossing, upon which he may to some extent, but not entirely, rely, and presume that it is safe for him to do so, and act upon the presumption, within reasonable limits.    The extent

to which he may rely upon such assurance and invitation is a question of fact for the jury unless it conclusively appears that he relied exclusively thereon, because the court cannot say that a prudent man would not be influenced to some material extent by them, and regulate his conduct accordingly. To assume otherwise would be against all human experience. Beach, Cont. Neg. § 62; 2 Shearman & R. Neg. § 466; 3 Elliott, Railr. § 1157; Glushing v. Sharp, 96 N. Y. 676; Palmer v. New York, 112 N. Y. 234, 19 N. E. 678; State v. Boston, 80 Me. 430, 15 Atl. 36; Warren v. Boston, 163 Mass. 484, 40 N. E. 895; Dundon v. New York, 67 Conn. 266, 34 Atl. 1041; Pennsylvania v. Stegemeier, 118 Ind. 305, 20 N. E. 843; Evans v. Lake Shore, 88 Mich. 442, 50 N. W. 386; Wilson v. New York, 18 R. I. 491, 29 Atl. 300.

It follows that the controlling fact in this case, which distinguishes it from those cited and relied upon by the defendant, is that the flagman was absent, whereby the plaintiff was assured that it was safe to go upon the crossing, and that he did not rely wholly upon such assurance, but did so to some extent. He did everything which the most cautious man would have done, except to absolutely stop his team and listen. We are not disposed to relax the rule that the track of the ordinary commercial railroad at a highway crossing is a place of peril, and itself a warning to one about to go upon it to exercise care, to the extent of his opportunity, and to use his senses of sight and hearing to discover an approaching train, and if he fails to heed the warning he is guilty of contributory negligence, and cannot recover if he be injured by a collision. A wise public policy and a proper administration of justice alike forbid that we should do so.

But this case is essentially unlike one where the party injured attempts to make the crossing where there is no affirmative assurance that it will be safe for him to do so. It is also unlike one where the negligence is a failure to ring the bell or sound the whistle at a crossing, for such negligence is no assurance, by one whose special duty it is to know, that the crossing is safe, nor is it an invitation to the traveler to keep on his way. In this case the evidence tends to show that the plaintiff was lured into a place of peril by the assurance of the defendant that it was one

of safety, and upon which he had a right, to some extent, to rely. This essential feature distinguishes this case from the ordinary crossing case, and makes it an exception to the rule we have stated. The extent to which the plaintiff might have prudently relied upon this assurance of safety, and whether or not, in the exercise of due care, he ought to have stopped his team and listened, are fairly debatable questions between reasonable men; hence it cannot be said, as a matter of law, that the plaintiff, under the special circumstances of this case, was bound to take the unusual precaution of entirely stopping his team before going upon the crossing.    Beanstrom v. Northern Pac. R. Co., 46 Minn. 193, 48 N. W. 778.

The question of the contributory negligence of the plaintiff was one of fact for the jury, and the trial court erred in not submitting the case to them.

Order reversed and a new trial granted.

LEWIS, J. (dissenting).

I dissent.   From the cases cited the court deduce this general principle:   If it conclusively appears that a traveler relied exclusively upon the assurance or invitation to cross the tracks which is implied by the absence of the flagman, then the negligence of the traveler is established as a matter of law; but, if he did not exclusively rely upon such assurances, then the question of his negligence is for the jury.   This seems to be a correct statement of the law applicable to such cases, but it is not correctly applied in this case.   There is certainly no reason for confining the means of observation to that medium by which the absence of the signal was ascertained.   In State v. Boston, 80 Me. 430, 443, 15 Atl. 36, cited in the opinion, the court say:

"If the gates were open and the crossing unattended by a flagman, then these persons had a right to accept the fact as some evidence that the train would not attempt to pass the crossing at a faster speed than six miles an hour.   Of course, full reliance cannot always be placed on an expectation that a railroad company will perform its duties, when there is any temptation to neglect them, because experience teaches us that it would not be practicable to do so."

Another reason why it is not wise to establish the rule that a traveler may with impunity exclusively rely upon such assurances is that the absence of the flagman might be caused by sudden sickness or an accident over which there was no control, and the traveler should anticipate such possibilities, and act with reasonable prudence in approaching a place of danger. The company is not a guarantor of the plaintiff's safety, and the authorities do not so hold. Where there is any dispute as to the facts, or as to whether the traveler exercised reasonable care, the question of contributory negligence is certainly for the jury. But in this case the facts are undisputed. It conclusively appears that the plaintiff relied exclusively upon his eyesight, and that he did not use his ears. He knew the danger and the time of the train. He made so much noise upon the rough, frozen road with his rattling lumber wagon that he could not hear the approaching train. He did not stop or slow up in order that he might hear. If he had stuffed cotton in his ears he would not more effectually have deprived himself of the opportunity to hear. It was not enough that he looked up and down the track as he approached it. His vision was obstructed almost entirely, and for that reason he was called upon to listen, and so drive that he could hear. If the customary signal had been a stationary bell, and the plaintiff, approaching and not hearing it sound the usual alarm, had bandaged his eyes and permitted his team to go upon the track, could it be said that he was not relying exclusively upon the invitation and assurance implied by the absence of the signal? But no more so than did the plaintiff rely exclusively upon his eyesight in this case by depriving himself of the use of his ears. He was not required to stop in order to get a better view; nor was he obliged to stop for the purpose of hearing more effectively, if he had not himself created the noise which prevented his hearing. His conduct being under his own control, and having failed to take the least precaution to listen, and it being certain that, if he had stopped his own noise and listened, he would have heard the approaching train, it appears, as a matter of law, that he was guilty of contributory negligence.

COLLINS, J. (dissenting).

I cannot assent to the doctrine of the main opinion. The plaintiff made no attempt to listen for the approaching train. He knew it was due, but drove on, unmindful of the fact that his wagon was making so much noise that his sense of hearing was gone, so far as the expected train was concerned. He relied exclusively upon his eyesight, depending entirely upon the vigilance of the flagman. The object of placing a flagman and gates at railway crossings is not to relieve the traveler upon the highway of care when approaching these dangerous places, but to further guard and protect him by additional signals. To the signal by whistle and bell is the man or the gates further warning and protection. The conclusion reached by the majority is a decided and dangerous encroachment upon the wise and salutary rule, long ago established, and not yet openly abandoned, that a person about to go upon a railway track must exercise care to the extent of his opportunity, and must use his senses of sight and hearing,—must listen as well as look. I therefore unite with Justice LEWIS in a dissent.