URCEL MUGGENBURG, BY PAUL MUGGENBURG,
HER FATHER AND NATURAL GUARDIAN, v.
MYRON F. LEIGHTON AND OTHERS.
SHIRLEY MUGGENBURG v. SAME.
MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILROAD
COMPANY AND ANOTHER, APPELLANTS.[1]

March 26, 1954.

Nos. 36,234, 36,235.

[1]Reported in 63 N. W. (2d) 533.

W. J. Quinn, Fordyce W. Crouch, and Philip Stringer, for appellants.

Meagher, Geer, Markham & Anderson, O. C. Adamson II, and E. J. Leathers, for respondent Leighton.

CHRISTIANSON, JUSTICE.

Separate actions were originally commenced in Ramsey county district court by plaintiffs, Shirley Muggenburg and Urcel Muggenburg, sisters, to recover damages for personal injuries resulting from an automobile-train collision. Plaintiffs alleged that their injuries were caused by the negligence of the defendants, Minneapolis, St. Paul & Sault Ste. Marie Railroad Company (hereafter called Soo Line), Chicago, Milwaukee, St. Paul & Pacific Railroad Company (hereafter called Milwaukee Railroad), and Myron F. Leighton, driver of the car in which the plaintiffs were riding. The actions were consolidated for the trial which was held in May 1952. The jury returned verdicts against both railroads but in favor of defendant Leighton.

Pending an appeal to this court by the railroads, the railroads and both plaintiffs entered into a stipulation of settlement. In consideration for the payment of a total sum less than the verdicts plaintiffs released the railroads from all liability growing out of the automobile-train collision. The stipulation expressly stated that it in no way affected any possible rights to contribution available to the railroads against Leighton. The initial appeal by the railroads was dismissed by this court as not being from an appealable order.[2] However, at that time we suggested that the railroads could obtain a review of the verdicts exonerating Leighton from liability, which if allowed to stand would foreclose a recovery by the railroads of contribution from Leighton under the rule of American Motorists Ins. Co. v. Vigen, 213 Minn. 120, 5 N. W. (2d) 397, 142 A. L. R. 722, by appealing from the judgments exonerating Leighton from all liability to the plaintiffs arising out of the accident in question. The railroads have followed our suggestion and accordingly we must

---

[2] See, Muggenburg v. Leighton, 240 Minn. 21, 60 N. W. (2d) 9.

now review the judgments entered in favor of Leighton, respondent in this appeal.

On the morning of May 19, 1950, a 1950 Ford automobile owned and driven by Leighton collided in St. Paul with a Soo Line passenger train at the intersection of Chestnut street and the main line tracks of the Milwaukee Railroad over which the Soo Line train was operating. The weather that ill-fated morning was dry, cloudy, and overcast. Plaintiffs, who were passengers in the automobile, and Leighton were proceeding to work at the time along a route which they infrequently traveled but which enabled them that particular morning to view flood conditions along the banks of the Mississippi River. After traveling east on "Levy Road" for some distance, they turned north on Chestnut street and in less than a block reached the railroad track upon which the Soo Line train was proceeding in a westerly direction to Minneapolis.

The railroad crossing where the accident occurred is composed of four sets of tracks running in a general east-west direction. Two of the four sets of tracks have their inception just a few feet east of the crossing at which point they switch off in a westerly direction from the two through-traffic tracks. This group of eight separate rails has an approximate total width of 21½ feet in the immediate area of the Chestnut street crossing. The train involved in the accident was traveling on the most northerly of the main line tracks. In addition to the above-mentioned four tracks, an industry-spur track, also running east and west, is located just south of the main line tracks and to the east of Chestnut street. This single track, however, does not traverse Chestnut street. At the time of the accident at least one boxcar was situated on the industry-spur track, its exact location however being in dispute.

Situated on both the southeast and northwest corners of the crossing are conventional Griswold railroad-crossing warning signals which may be briefly described as consisting of a crossbuck sign, a rotating stop sign, and two alternate flashing red lights which face both north and south. The warning signal on the southeast corner is approximately eight to nine feet south of the nearest rail. At the time of the accident both signals were manually operated by

means of a switch located in what is termed a railroad tower at the northeast corner of the crossing. The grade of Chestnut street is relatively level between "Levy Road" and the crossing, but there is a slight but fairly abrupt incline just south of the crossing. Located on the southeast corner of the crossing, some 18 to 20 feet south of the most southerly main line track, is a fairly large building referred to as the Old Style Lager building. Because of the presence of this building, which extends for some distance to the east of Chestnut street, it is impossible when traveling north on Chestnut street to see any appreciable distance down the tracks in an easterly direction until a position is reached from which a view can be obtained around the northwest corner of the building.

Although there is considerable dispute concerning the other pertinent facts surrounding the accident, in viewing the evidence, as we must, in the light most favorable to the verdicts exonerating Leighton from all liability, the following additional facts appear. Leighton, after making the turn north from "Levy Road," traveled on Chestnut street at a top speed of 25 miles per hour, but as he neared the railroad crossing he reduced his speed to 15 to 20 miles per hour. Leighton first looked to his right when he was in a position, when seated in his car, almost directly opposite the north edge of the Old Style Lager building or roughly 40 feet from the center of the track on which the train was approaching. It was at the time of this initial glance that Leighton first became aware of the train. Rather than attempting to stop in order to avoid the oncoming train, he swerved slightly to the left and accelerated as much as possible before being hit. The engine struck the right rear corner of the car and pushed it against the warning signal at the northwest corner of the crossing.

At all times during the approach of Leighton's car to the crossing, the warning signal did not register stop nor did the red lights attached to the signal flash any warning. Further, no whistle was sounded by the train as it approached the crossing nor was any warning given by the ringing of the train's bell. Estimates of the speed of the train as it approached the crossing ranged from 20 to 25 up to 40 to 45 miles per hour.

The only direct testimony regarding viewing distances available to Leighton in an easterly direction from various points on Chestnut street was given by an engineer from the Soo Line. He stated that at a distance of 70 feet from the center of the track on which the train was traveling, Leighton had a view down the track in an easterly direction of 85 feet from the center line of Chestnut street; at 65 feet, a view of 92 feet could be had; at 60 feet, a view of 105 feet; at 50 feet, a view of 161 feet; at 45 feet, a view of 264 feet; and at 40 feet, a view of 296 feet was possible. In their brief, Leighton's counsel assert that these calculations, which were made from a diagram drawn to scale and offered into evidence by the railroads, are both misleading and erroneous. They point out that in the first place the railroads' calculations are all measured from the center line of Chestnut street to the tracks which would mean Leighton was exactly in the middle of the street as he approached the crossing and secondly they are calculated on the basis of the boxcar located on the spur track being 102.6 feet east of the east line of Chestnut street whereas there was also testimony that it was probably only 60 to 70 feet from the crossing. Leighton's counsel set forth in respondent's brief certain calculations they have made from the scale diagram admitted into evidence which are based upon Leighton being in the center of the right lane of traffic or in other words ten feet east of the center line of Chestnut street. Their calculations indicate that at 70 feet from the center of the westbound main line track on which the train was traveling, a view of about 70 feet is possible; at 65 feet, a view of about 77½ feet; and at 60 feet, a view of about 87½ feet could be had. They had not calculated the visual distances at locations closer to the crossing, but it appears from the scale diagram that if the boxcar on the spur track was located at a point 60 or 70 feet from the crossing the viewing distance at locations between 40 and 45 feet south of the center of the westbound main line track would be substantially lessened.

■ The appellant railroads in the first instance contend that Leighton was guilty of negligence as a matter of law. The rule in this state which prescribes the standard of care required of a trav-

eler when approaching a railroad crossing guarded by a warning device similar to that present in the instant case is well stated in Haugen v. N. P. Ry. Co. 132 Minn. 54, 56, 155 N. W. 1058, where this court said:

"* * * These decisions establish the rule that, where a railroad company supplies safety gates at a crossing which it is in the habit of closing as its trains approach, the fact that the gates stand open is an assurance of safety and an invitation to travelers to pass; that this is not, however, an unqualified assurance or invitation, for the traveler may not even then close his eyes and ears to danger. If he relies exclusively upon the assurance or invitation which is implied by the open gates, he is negligent. If he does not rely exclusively on such assurance, then the question is whether he exercises a degree of care that is reasonable under the circumstances, and that question must be one of fact for the jury, unless the facts leave the inference of negligence so plain that reasonable men could not draw different conclusions therefrom."

The rule that a driver may not exclusively rely on a railroad-crossing warning device is also set forth in Woehrle v. Minnesota Transfer Ry. Co. 82 Minn. 165, 169, 84 N. W. 791, 793, 52 L. R. A. 348, where it was stated:

"In such cases the raised gates or the absence of the flagman is an assurance to the traveler of safety, and an implied invitation to make the crossing, upon which he may to some extent, but not entirely, rely, and presume that it is safe for him to do so, and act upon the presumption, within reasonable limits. The extent to which he may rely upon such assurance and invitation is a question of fact for the jury unless it conclusively appears that he relied exclusively thereon, because the court cannot say that a prudent man would not be influenced to some material extent by them, and regulate his conduct accordingly."

See, also, Wardner v. G. N. Ry. Co. 96 Minn. 382, 104 N. W. 1084; Buelow v. Chicago, R. I. & P. Ry. Co. 164 Minn. 52, 204 N. W. 571.

■ The railroads argue that Leighton was negligent as a matter

of law since his own testimony states that in determining whether to cross the tracks he relied exclusively on the mechanical warning signal which failed to warn of the oncoming train. It is true that on cross-examination Leighton, in response to a leading question, did state that he relied solely on the signal when proceeding on to the crossing. However, it is also a part of Leighton's testimony that he looked for a train even though the signal was not registering stop and that although he depended upon the signs he also looked and listened. Such behavior is hardly consistent with the idea that he exclusively relied on the signal. Since this court is not free to accept only a part of a witness's testimony and since we must view the testimony in the light most favorable to the verdicts for Leighton, it is manifestly clear that negligence as a matter of law cannot be based solely on the single statement indicating exclusive reliance which was extracted on cross-examination.

Even though Leighton did not exclusively rely on the mechanical warning signal when approaching the crossing, his conduct under all the circumstances may still be so devoid of care as to constitute negligence as a matter of law. By making a few simple mathematical calculations it is possible to get a rough but nonetheless revealing idea of the place at which Leighton could first observe the train by looking to his right. From the testimony of the Soo Line's engineer concerning viewing distance in an easterly direction, it becomes evident that if Leighton's car was proceeding at 15 miles per hour and the train at 25 miles per hour, the train would be barely visible when Leighton was about 60 feet from the center of the westbound main line track. If the testimony of Leighton estimating the speed of the train at 40 to 45 miles per hour is substituted for the 25-mile-per-hour figure, the train would not be visible before Leighton was 50 to 55 feet from the center of the westbound main line track. The distance to the point of impact from where it is first possible to see the train is even further reduced if the available viewing distances suggested in respondent's brief are used in the calculations. If the calculation most favorable to Leighton regarding his position on Chestnut street when the train was first visible is taken as fact, it would mean that when he looked to

the right almost directly opposite the Old Style Lager building, it was approximately one-half a second after the train came into view. If the figure of 60 feet from the center of the westbound main line track is taken as the place where a view of the train was first possible, Leighton looked to his right approximately one second after the train came into view.

The railroads have referred us to several cases in which this court has found negligence as a matter of law when the traveler had an available view of an approaching train for a comparable or even shorter distance than Leighton had in the instant case.[3] All these cases, however, are clearly distinguishable from the present case by the fact that in none of these cases was the crossing equipped with a warning device which gave notice to travelers of an approaching train. If such a warning device gives the appearance to travelers that no train is approaching, it is understandable that a traveler will rely to some extent on its accuracy when approaching the tracks. This element of reliance has made this court reluctant to find a traveler negligent as a matter of law for failing to adequately look and listen at such controlled crossings.[4] The fact that a crossing is so protected does not mean the railroad guarantees the crossing is safe at the risk of certain liability if it is not. But if such a warning device is relied upon to some extent short of exclusive reliance by the traveler, ordinarily the question of the traveler's negligence will be one for the jury. This is particularly true where, as here, the crossing is so situated that any appreciable view of the tracks by approaching motorists is obstructed for some distance from the crossing.

[3]Bailey v. Minneapolis, St. P. & S. S. M. Ry. Co. 166 Minn. 118, 207 N. W. 26, 560; Jones v. G. N. Ry. Co. 178 Minn. 322, 227 N. W. 45; Farden v. G. N. Ry. Co. 189 Minn. 17, 248 N. W. 284; Luce v. G. N. Ry. Co. 203 Minn. 470, 281 N. W. 812; Dahlquist v. Minneapolis & St. L. Ry. Co. 230 Minn. 203, 41 N. W. (2d) 587; Rogge v. G. N. Ry. Co. 233 Minn. 255, 47 N. W. (2d) 475; Hicks v. N. P. Ry. Co. 239 Minn. 373, 58 N. W. (2d) 750.

[4]See, Stegner v. Chicago, M. & St. P. Ry. Co. 94 Minn. 166, 102 N. W. 205; Summer v. Chicago & N. W. Ry. Co. 122 Minn. 44, 141 N. W. 854; Stepp v. Minneapolis & St. L. R. Co. 137 Minn. 117, 162 N. W. 1051; compare, Schneider v. N. P. Ry. Co. 81 Minn. 383, 84 N. W. 124.

From the evidence in the instant case it seems fair to say that if Leighton had looked on an angle to his right past the corner of the Old Style Lager building when the train first came into view he would have seen the train not over a second, and likely even less than a second, before he actually did. In Flygen v. Chicago, M. & St. P. Ry. Co. 115 Minn. 197, 198, 132 N. W. 10, 11, this court, in holding a traveler involved in a railroad crossing accident not negligent as a matter of law, said:

"* * * His line of vision was unobstructed, and if he had looked carefully he would have discovered the approaching train; but he was entitled to assume that no trains were immediately coming, when he discovered that the gates were up and no watchman was on guard. * * * Under the circumstances, it became a question for the jury whether he acted with that degree of care common to men of ordinary prudence."

See, also, Dahlquist v. Minneapolis & St. L. Ry. Co. 230 Minn. 203, 206, 41 N. W. (2d) 587, 589.

In addition to the relatively short time interval between the instant Leighton looked and the time when he could have first seen the train, other factors must be considered as having a bearing on the reasonableness of his conduct in not looking to the right before reaching the edge of the Old Style Lager building. Leighton's attention at least in part was concerned with steering and otherwise handling his car. Further, he received no warning of the train from any whistle or bell on the train itself.[5] It was also established that upon nearing the crossing Leighton reduced the speed at which he was traveling from 20 to 25 miles per hour to a speed of 15 to 20 miles per hour which, particularly in view of the fact that the

---

[5]Failure to sound a whistle or bell was not negligence on the part of the railroads because of the existence of a city ordinance prohibiting such action. Nevertheless the fact that Leighton did not receive notice of the approaching train in that manner is a factor to be considered in examining the reasonableness of his conduct. See, Green v. G. N. Ry. Co. 123 Minn. 279, 143 N. W. 722; Hicks v. N. P. Ry. Co. 239 Minn. 373, 58 N. W. (2d) 750; N. P. Ry. Co. v. Haugan (8 Cir.) 184 F. (2d) 472; 5 Dunnell, Dig. & Supp. § 8175.

crossing signal indicated no approaching danger, can hardly be termed excessive. Although the visual obstructions and speed of the car made the first possible view of the train virtually the last which would have warned him soon enough to enable him to stop, nevertheless, in light of the invitation offered by the inoperative mechanical crossing signal which unquestionably influenced both Leighton's speed and diligence for observation, we are not willing to hold Leighton's conduct prior to his seeing the train negligent as a matter of law. If the enticement of a silent warning signal is to be given consideration, as it must, in evaluating a motorist's conduct, it would seem that the situation presented here is precisely the type of case where the failure of the signal to give warning is controlling.

The railroads further argue that if Leighton did in fact first look and see the train when he reached the edge of the Old Style Lager building, he was negligent as a matter of law in accelerating and thus attempting to beat the train to the crossing rather than stopping short of the train. The railroads cite as controlling Krtinich v. Duluth, M. & I. R. Ry. Co. 206 Minn. 106, 287 N. W. 870, where this court upheld a directed verdict for the defendant railroad on the ground that since the presence of an approaching train was actually known by the automobile driver sufficiently in advance to have stopped, any negligence of the railroad in not keeping the crossing signal in operating order was not the proximate cause of the injury and that the driver's negligence was the sole cause. The Krtinich case, however, is clearly distinguishable from the instant case by the fact that there the driver had a much greater viewing distance available to him and he had ample time and distance in which to stop after becoming aware of the approaching train. Leighton testified that at the speed of 15 to 20 miles per hour he could stop in a distance of 35 to 40 feet. Although Leighton first became aware of the train when he was about 40 feet from the center of the track on which the train was proceeding, the distance between the car and the train could more accurately be stated to be nearer 30 feet because of the overhang of the train over the rails and the fact that the front of the car is considerably nearer the tracks than the driver seated therein. In view of the time in which it would take to stop

the car in relation to the distance between the car and the train plus the fact that Leighton was nearly successful in his attempt to cross ahead of the train, the right rear corner of the car being the point of impact, we cannot say as a matter of law that Leighton was negligent in not attempting to stop after seeing the train.

■ The railroads next assign as error the refusal of the trial court to give certain requested instructions to the jury. Their arguments are primarily directed at the refusal of the trial court to instruct the jury as follows:

"A railroad grade crossing is a place of danger and the track itself is a warning. A traveler about to cross is charged with notice of the probability of approaching trains at all times and must look and listen, but need not necessarily halt when trains are neither seen nor heard. He must alertly use his sight and hearing to discover their approach. Within reasonable limits he may act upon the assumption that due care will be exercised in the management of trains and in giving crossing signals. The failure to give the usual crossing signals may justify a traveler in relaxing somewhat in his vigilance, but does not excuse him from looking and listening before going upon the track."

This requested instruction is taken verbatim from this court's opinion in Anderson v. G. N. Ry. Co. 147 Minn. 118, 120, 179 N. W. 687, 688. That case involved an automobile-train collision occurring at a railroad crossing which was not protected by any mechanical signal, gates, or a flagman. The reference in the opinion to "usual crossing signals" applied only to the signals given by an approaching train such as the blowing of a whistle or the ringing of a bell. There is, however, a vast difference between the extent of assurance that a crossing is safe to traverse given by a silent inoperative mechanical crossing signal and that given by the failure of a train to give notice of its approach. Woehrle v. Minnesota Transfer Ry. Co. 82 Minn. 165, 84 N. W. 791, 52 L. R. A. 348. Although an inoperative mechanical crossing signal which registers no warning does not affirmatively tell the traveler to proceed as does a traffic intersection green light, it does nevertheless by its presence in plain view

of the traveler serve as a more positive invitation to proceed than not hearing a train whistle or bell, the significance of which the traveler is aware of, if at all, only if he entertains a generally uncommon pre-fixed notion that trains always sound a warning signal when approaching a crossing. Further, a traveler is more prone to rely on a mechanical crossing signal which he generally presumes operates automatically than on a train signal, the accuracy of which involves the risk of human error.[6] Since the requested instruction fails to give full significance to the affirmative representation presented by an inoperative mechanical crossing signal, it was properly rejected by the trial court. We have also considered the other requested instructions, which are assigned as error, dealing with the duty to look and listen at a railroad crossing and find that they present no grounds for reversal.

■ At the conclusion of the trial court's instructions to the jury, the railroads took exception to the refusal to give certain requested instructions but made no objection to the instructions actually given or any part thereof. In their motion for judgment notwithstanding the verdicts or for a new trial, the railroads stated as one of their grounds for a new trial that the trial court erroneously instructed the jury in the manner hereinafter set forth. The railroads, however, failed to include the challenged instruction in their assignments of error and only assign the denial of certain requested instructions as error in this court. It is thus somewhat questionable whether the correctness of the instruction actually given by the trial court is properly before us for our consideration. See, Corrigan v. Foot, 126 Minn. 531, 148 N. W. 98. Nevertheless, in the interest of all concerned, we will review the validity of the instruction.

The instruction complained of reads as follows:

"The defendant, Mr. Leighton, had the right to assume that the crossing would be safe to use, if the warning signal was not on. He

---

[6]Although the crossing signal in the instant case was manually operated, it nevertheless gave the appearance of being no different than an ordinary automatic crossing signal.

was nevertheless obligated to use such reasonable care, by looking and listening, as a person of ordinary prudence would use under like circumstances. The degree of care and vigilance to be exercised by Mr. Leighton must be considered in the light of the fact, if the signal was not turned to 'stop' and the lights were not flashing, such a condition would constitute an invitation to him to use the crossing and assurance to him that it could be used with safety."

The railroads take the position that the instruction given by the trial court is erroneous as it is practically the same as telling the jury that Leighton could rely exclusively on the warning signal and need not have looked or listened at all. Standing alone, the last sentence of the instruction would be clearly misleading to the jury since it fails to make it clear that the invitation and assurance offered by an inoperative crossing signal is not unqualified or absolute in the sense that a traveler can exclusively rely on the signal. However, the requirement that the traveler when approaching a crossing must nevertheless exercise reasonable care by looking and listening is correctly stated in the preceding sentence. The issue thus presented is whether this expression of the required duty of care would reasonably be understood by the jury to qualify the later-expressed idea of the signal being an invitation and assurance of safety. It is our opinion that the instruction taken as a whole would reasonably be so understood, particularly when considered together with the trial court's general charge to the jury.[7] Indeed the fact that learned counsel for appellants who were present and who are highly trained to detect misleading statements of the law failed to make any objection at the time of the trial to the instruction as given is some evidence of the fact that it was not patently misleading. Despite our holding in this case, however, we feel obliged to say that we do not endorse the instruction as given or recommend that it be used in future similar cases unless the concept of invitation and assurance is more clearly qualified in line with the views previously expressed herein.

[7]See, Cameron v. Evans, 241 Minn. 200, 62 N. W. (2d) 793; Barnes v. Northwest Airlines, Inc. 233 Minn. 410, 47 N. W. (2d) 180.

The railroads also assign as error the refusal of the trial court to give a requested instruction to the effect that the speed at which the train was being operated was not negligent. Since the question of whether the railroads were negligent by the operation of the train at an excessive speed only affects the liability of the railroads to the injured plaintiffs, it is in no way material in this appeal which involves only the liability of Leighton. Furthermore, a careful reading of the instructions as a whole convinces us that the issue of negligence arising from the speed of the train was in fact withdrawn from the jury.

■ The railroads assign as error the trial court's exclusion of certain proffered testimony on the ground of hearsay. A few months prior to trial interrogatories were served upon the railroads requesting the names of all known witnesses. Although a Mrs. Stemig was not listed as a known witness in the answers to the interrogatories, she was nevertheless called by the railroads as a witness at the trial. In direct examination she testified that just shortly before the collision in question she had gone out on the porch of her house, which was situated a short distance north of the crossing on Chestnut street, to talk to her husband who was seated thereon and that at that time she observed that the red lights on the two mechanical warning signals at the crossing were flashing. She further testified, however, that she did not see the collision in question, having re-entered the house a short time before. On cross-examination, in answer to a question whether the week of the trial was the first time she ever knew that she might be a witness in the case, she testified: "I told them when they first came what I had seen. But they didn't think I should be a witness." After the close of all testimony and just prior to the parties resting, Leighton's counsel within the hearing of the jury requested that it appear that the answers to the interrogatories submitted to the railroads concerning known witnesses did not contain the name of Mrs. Stemig. Counsel for the railroads agreed that Mrs. Stemig's name was not included but at the same time sought to explain the deficiency in a manner which will be alluded to later. After all parties had rested the railroads sought permission, which was granted without objection, to reopen

their case, and the claim agent who investigated the case for the Soo Line was called as a witness. He was asked "Did you ask Mrs. Stemig whether she had seen this accident?" to which an objection of hearsay, leading, and suggestive was sustained. The railroads then made an offer of proof outside the hearing of the jury to the effect that the claim agent would testify that when he interviewed Mrs. Stemig after the accident he only asked her whether she had seen the accident and she informed him that she had not, and that it was not discovered until the past week that she had any knowledge concerning any material facts. An objection to this offer of proof was sustained on the ground of hearsay.

The railroads contend that not only was the excluded evidence not hearsay but that its rejection was highly prejudicial since it precluded a showing of the true facts regarding the failure to include Mrs. Stemig's name in the answers to the interrogatories and thus left the jury with the impression that the railroads had either falsified their answers to the interrogatories by concealing the existence of Mrs. Stemig as a witness or induced her shortly before trial to fabricate the story she told on the stand. They also contend that because of the marital relationship an unwarranted cloud was cast upon the testimony of her husband, Joseph Stemig, who testified that the mechanical warning signals were flashing as Leighton approached the crossing.

While it is manifestly apparent that the proffered testimony was not hearsay in view of the fact that it was offered solely for the purpose of showing that at the time the interrogatories were answered the railroads in good faith thought that Mrs. Stemig was not a witness to any material facts surrounding the accident, nevertheless it is our opinion that no harm resulted from the court's ruling so as to constitute reversible error. The record discloses that when Leighton's counsel requested that it be noted that Mrs. Stemig's name was not included in the answers to the interrogatories concerning known witnesses, counsel for the railroads, within the hearing of the jury, explained the omission in the following manner:

"Mr. Stringer [counsel for the railroads]: It is agreed that is correct [that Mrs. Stemig's name was not included in the answers to the interrogatories], provided it is also understood that the answers were submitted something like two months ago.

"Mr. Geer [counsel for Leighton]: I neglected that in the statement.

"Mr. Stringer: *At a time when Mrs. Stemig was not known to be a witness?*

"Mr. Geer: She testified she reported this right after the accident to the Company.

"The Court: *Mr. Stringer has a right to say it was not known to them.*" (Italics supplied.)

It seems apparent from the record that in this colloquy between counsel the basic contention of the railroads concerning the omission of Mrs. Stemig's name in the answers to the interrogatories was made known to the jury. Any testimony by the claim agent who investigated the accident for the Soo Line, even though more detailed, would have been merely a further explanation of the railroads' position. See, Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804. Although the railroads now vigorously complain that they were deprived of an opportunity to rebut any erroneous impressions created in the jury's mind concerning the matter in question, it is significant that they freely participated in the discussion with Leighton's counsel when it was first revealed to the jury that the railroads omitted Mrs. Stemig's name in answer to the interrogatories concerning known witnesses. Further, the railroads made no effort to clarify matters during the redirect examination of Mrs. Stemig but instead waited until all parties had rested necessitating a reopening of their case before offering to submit evidence on the point. In the instant case, the trial court did not exclude the proffered testimony on the basis of immateriality, repetition, or other similar grounds which are largely within the discretion of the trial court. However, it is apparent that this is the type of collateral matter which should in large part be left to the discretion of the trial court.

It follows from what we have said that the judgments in favor of Leighton should be affirmed.

Affirmed.

