YOUNGER *v.* CAROSELLI.

1. EQUITY—JURISDICTION.
   When court of equity takes jurisdiction for any purpose, it will retain it to grant complete relief.

2. VENDOR AND PURCHASER—FORECLOSURE—EQUITY—JURISDICTION.
   In vendors' suit to foreclose land contract, where proofs showed that they were at fault in building driveway and garage in such manner that they were not usable, court of equity had jurisdiction to grant vendees relief, on their cross-bill, rescinding contract and awarding money damages for amount they had invested in premises, with lien therefor.

3. SAME—RESCISSION—CONSIDERATION—FAULT—FRAUD.
   Land contract may be rescinded for failure of consideration through vendor's fault as well as on account of his fraud.

Appeal from Wayne; Gilbert (Parm C.), J., presiding. Submitted June 11, 1930. (Docket No. 116, Calendar No. 35,092.) Decided October 3, 1930.

Bill by George W. Younger and another against Alfred L. Caroselli and another to foreclose a land contract. Cross-bill by defendants. From decree for defendants, plaintiffs appeal. Affirmed.

*Bulkley, Ledyard, Mills & Dickinson* (*Harold R. Smith* and *Augustus C. Ledyard,* of counsel), for plaintiffs.

*Anthony Maiullo,* for defendants.

BUTZEL, J. Alfred L. Caroselli, an interior decorator and also a music teacher, desired to have a house and garage built for himself and his wife,

As to right of vendee under executory contract to lien on land for amount unpaid thereon, where contract fails or is rescinded, see annotation in 20 L. R. A. (N. S.) 175; 45 A. L. R. 353; 59 A. L. R. 226.

Lillian, the defendants, cross-plaintiffs, and appellees in this case. He had purchased on land contract lot numbered 913 of the East Detroit Development Subdivision No. 2. George W. Younger, a building contractor of over 30 years' experience, and his wife are the plaintiffs, cross-defendants and appellants herein. Among the very large number of houses with garages he had erected in the city of Detroit, there was one almost opposite lot No. 913 that attracted Caroselli's attention. He desired a similar one built upon his lot. The house and garage were typical of many that had been built by Younger according to what is referred to as a "stock" plan. Caroselli sought out Younger, who arranged to build such a house with a garage with certain changes. The lot was 40 feet in width. The house was to be 30 feet wide, plus a bay extending another foot, thus making the total width 31 feet. According to the building restrictions, with which Younger was acquainted, it was necessary to build at least three feet distant from the south line of the lot. This left six feet on the north side of the lot for the driveway to the garage. The plan, specifications, and contract were all drawn by Younger or his assistant. Two of the provisions of the specifications are as follows:

"*Survey.* The lot line shall be laid out by a surveyor who will be employed and whose fees shall be paid by the general contractor.
"*Staked out.* Contractor shall do his own staking out of both house and garage."

Caroselli and his wife had been purchasing the lot on contract for the sum of $1,775. They had paid on the contract $1,108 plus some interest and taxes. They still owed $667.91, which sum was paid by Younger after the transfer of the contract to him, this balance due being added to the amount that

Caroselli was to pay. A land contract was executed by Younger and wife as vendors to Caroselli and wife as vendees. For reasons unexplained, the vendees were given credit for $3,000 as first payment. They were to pay in monthly installments an amount equal to an agreed price for the house and garage, plus the balance that Younger paid on the contract assigned to him in order to obtain the deed. Caroselli, being an interior decorator, was to do the painting and was also to furnish some other items for the house, credit for all of which was reflected in the lowering of the purchase price of the house.

It is evident that insufficient consideration was given to the dimensions of the house, garage, and particularly to the driveway leading from the street to the garage, as well as that adjoining the garage. The very fact that the plan itself, as submitted to the city for a building permit, called for a house of 31 feet in width without the bay, when as a matter of fact, it was only 30 feet wide, would indicate that little attention was paid to some important details. There was some question as to the location of the bay window, and at Caroselli's request, it was built on the south side of the house on account of the more favorable exposure it would thus have. There was also some further discussion as to the position of the garage, and there is a dispute in the testimony as to who was responsible for locating the garage so that there was not sufficient room left between the house and garage, with the result that it became impossible to use the more northerly door of the garage for the ingress or egress of cars. Were this the only question, however, it is probable that no difficulties would have arisen.

Caroselli was frequently on the premises during the construction of the house and watched its

progress. The testimony is in dispute as to whether Caroselli knew that the driveway was so extremely narrow that it could not be used. The house and garage were first completed and then the concrete was laid for the driveway. When Caroselli did finally test the driveway, he found it was too narrow for use except by a small sized car. If the car were a large one or had large hub caps, it could not get in at all. If the car was narrow enough so as to be driven in, it could only be backed out, for there was not enough room to turn it around. The testimony leaves no doubt that the driveway and also the garage, as far as the storage of automobiles is concerned, are of no value. Under the circumstances, the property would be more valuable with neither a driveway nor a garage situated upon it. Under his contract, Caroselli was entitled to a double garage with a driveway. He did not contract for a house without them. Younger virtually admits that the driveway is too narrow. He stated that he purchased the lot adjoining the south side of the premises in dispute, built a house, and, on the sale thereof, reserved an easement so that in the event that he was to retake and resell the Caroselli property, there would be sufficient room on the south side of the house to drive in to the garage. He offered at the hearing to turn over this easement to Caroselli without extra charge, but the latter stated that he wanted a driveway that would belong to himself alone and where he could park his car if he saw fit at any time. The easement provided that the driveway would have to be kept clear at all times. Although we are impressed with the fairness of Younger in making this offer, nevertheless, Caroselli was not obliged to accept it. He claims that he made no objection to the width of the drive-

way during the course of construction because he did not realize it was too narrow to be of any value because he believed that Younger, an experienced builder, was erecting a driveway and garage that would be usable. Younger claims that Caroselli tried out the driveway during the progress of the erection of the house, but at that time the driveway was not paved nor inclosed by the fence which the owner of the adjoining property subsequently built flush with the south side of the driveway. The owner of the house on the opposite side of the street, after which the Caroselli house was patterned, testified that his driveway was being used, although only six feet in width, but it developed that there was no fence erected along the side of the driveway so that the car entering the driveway could be driven partly on the ridge of the adjoining land. It was further shown on the examination of the carpenter who worked on the contract and who was plaintiffs' witness, that there are some drain pipes within the six-foot clearance of the driveway; that the brick sills of the basement windows extended about 1½ inches into the clearance, and there is a five-inch or six-inch curb built along the side of the house within the clearance. These do not exist in the driveway of the house on the opposite side of the street.

The testimony conclusively shows that the driveway is too narrow to be of ordinary use by automobiles of the usual width, and that the garage is therefore inaccessible to cars. Upon completion of the driveway and ascertaining its uselessness, Caroselli refused to take possession of the property and make any payments on the contract. Thereupon suit was brought for repossession before the circuit court commissioner, but was dismissed on the ground that the contract amounted virtually to a

mortgage and that a court of equity solely had jurisdiction. Thereupon, the suit was begun by plaintiffs, who asked for the foreclosure of the contract and for such other equitable relief as they might be entitled to. Defendants in their answer and cross-bill set forth their side of the controversy, and asked that they be given a money judgment for their actual investment in the property. This consisted of payments that they had made on the lot, together with the sums allowed them for decorating, plus the cost of window shades, electrical fixtures, etc. In all, it amounted to $2,000. They also asked for such other equitable relief as they in turn would be entitled to. The circuit judge, who saw all of the witnesses, came to the conclusion that the equities were in favor of defendants and cross-plaintiffs. He entered a decree of $2,000 in favor of defendants and cross-plaintiffs, imposed a lien for this amount against the premises, and further directed defendants to give plaintiffs a deed upon the payment of the amount of the decree.

Younger was an experienced builder, who must or should have known that when he was called upon to build a driveway and garage, he was not to build something that was practically useless for the purposes for which it was intended. Even though Caroselli signed the plans and specifications, he did so in the belief that they provided for a usable garage and driveway. It was Younger's duty to tell him then and there that, if he built the driveway and garage in accordance with the plans and specifications prepared by Younger, they could not be used for the purposes for which they were built. There is no question but that Caroselli stood by and did not protest against the narrowness of the driveway so that the garage would be inaccessible. His explanation, however, shows that he did it in ignor-

ance of the fact that it was too narrow, and in reliance upon the belief that Younger, an experienced builder, knew his business. The judge stated that the contractor knew or should have known exactly what he was building for this man. He knew what the effect would be of placing the portion of the garage in too close a proximity to the house. He not only drew the plans and contract, but he alone undertook to stake out both house and garage under the specifications. While there is no doubt that the mistake was unintentionally made, we believe the judge was correct in his ruling in finding the contractor was to blame for staking out the lot so that the garage and driveway were too narrow for ordinary use by automobiles.

It is further claimed that equity had no jurisdiction to give defendants the relief granted, and that their sole remedy was at law. Plaintiffs originally invoked the aid of a court of equity to foreclose their lien upon the property. Having thus been brought into court, defendants and cross-plaintiffs, in their answer and cross-bill, not only denied plaintiffs' claim but also sought equitable relief. There is no question but that the court of equity properly took jurisdiction in the first instance. Having done this, it had a right to dispose of all the questions involved. When a court of equity takes jurisdiction for any purpose, it will retain it to grant complete relief. *Gillen* v. *Wakefield State Bank,* 246 Mich. 158. This is not an independent suit brought by plaintiffs to recover damages. It is a suit in which the respective rights of all the parties must be determined, and which was brought properly in the first instance to foreclose the lien.

It is further claimed that the action of defendants amounts to a rescission of the contract, and that it was their duty to put the parties *in statu quo*

before they could recover. It is obvious from the record that this cannot be done. Defendants cannot take their decorations out of the house nor can the building be removed to another lot without a loss and expense far in excess of the amount found due defendants. It was also objected that the court had no right to impose a lien for the amount found due defendants.

A contract may be rescinded for failure of consideration through the vendor's fault as well as on account of his fraud. Thereupon a court may upon entering a decree impose a lien upon the property in favor of the vendee for the payments made upon the executory contract to purchase. *Witte* v. *Hobolth*, 224 Mich. 286; *German Bundesheim Society* v. *Schmidt*, 242 Mich. 139. A failure of consideration on account of the vendor's fault operates against the vendee the same as if he had been defrauded, and if there are grounds for equitable jurisdiction, the vendee should be entitled to a lien on the premises for the amount invested by him in the property. In the case of *Elterman* v. *Hyman*, 192 N. Y. 113 (84 N. E. 937, 15 Ann. Cas. 819, 127 Am. St. Rep. 862), an action was brought to recover the amount paid on the contract for the purchase of land and to establish and enforce a lien therefor on the ground of failure of consideration. The following are excerpts from the court's opinion:

"The right of a vendor to a lien for the purchase money unpaid is well established, and the courts of this State have uniformly recognized the right of a vendee to a lien when he was in possession, or had made improvements, or where special equities intervened. * * *

"We find no well-considered case in any State that denies a lien to the vendee, even if payment is

the only ground therefor, except such as withhold a lien from the vendor also. The doctrine is well established in England where it is sometimes said to have originated as recently as 1855, but it was clearly announced nearly twenty years before the Revolutionary war by a court of which Lord Mansfield was a member.   *   *   *

"In 1864 the question was fully discussed in the House of Lords and it was adjudged without dissent that the vendee has a lien, because every payment by him is *pro tanto* performance of the contract on his part and in equity transfers to him a corresponding portion of the estate.   *   *   *

"Whether the foundation of the lien is natural equity, imputed intention, partial ownership, the implication of a trust, or a blending of some of these sources, the authorities, almost without exception in those jurisdictions which give a lien to the grantor, are clear that one exists. As the vendor has a lien because he owned the land but conveyed prematurely, and the vendee ought not to keep it without paying for it, so, as it seems to me, the vendee has a lien because he has paid for the land pursuant to contract, and as he cannot get the land, he has a right to get out what he put in on the faith of the land."

To like effect are *Ihrke* v. *Continental Life Ins. & Investment Co.,* 91 Wash. 342 (157 Pac. 866, L. R. A. 1916F, 430), and *Stults* v. *Brown,* 112 Ind. 370 (14 N. E. 230, 2 Am. St. Rep. 190).

The judge was not in error in imposing a lien in favor of defendants and cross-plaintiffs. The decree' of the lower court is affirmed, with costs to defendants and cross-plaintiffs.

WIEST, C. J., and CLARK, McDONALD, POTTER, SHARPE, NORTH, and FEAD, JJ., concurred.