## W. H. BARBER COMPANY v. CITY OF MINNEAPOLIS AND OTHERS.
## LLOYD J. QUAID AND OTHERS, INTERVENERS.[1]

October 15, 1948.

Nos. 34,637, 34,638.

---

[1] Reported in 34 N. W. (2d) 710.

78

*John F. Bonner,* City Attorney, and *Palmer B. Rasmusson,* Assistant City Attorney, for defendant appellants.

*Kaplan, Edelman & Kaplan,* for intervener appellants.

*Loring & Anderson, Dorsey, Colman, Barker, Scott & Barber,* and *David E. Bronson,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action by W. H. Barber Company, a corporation, against the city of Minneapolis to have adjudged valid a certain building permit theretofore issued by the city for the construction of an additional floor to a one-story office building on certain real estate belonging to plaintiff, and to enjoin the city from interfering with the construction of such addition.

The city denied plaintiff's allegations that the real estate had been zoned for "light industrial" uses so as to permit the construction of the described addition, and at the trial it presented evidence that under what defendants contended was the official zoning map the premises had been zoned for "multiple dwelling" use only, which did not authorize the construction of the described addition. Interveners, who are property owners in the immediate vicinity of the planned construction, presented evidence in support of the city's contentions.

At the close of the trial, the court made findings determining that the real estate had been zoned for "light industrial" use; that the building permit previously issued for the additional floor was valid and remained in full force and effect; and, further, that interveners' claims were barred by laches and estoppel. Defendants and interveners were enjoined from interfering with plaintiff's construction work as above described. From an order denying defendants' and interveners' subsequent motions for amended findings or a new trial, these appeals are taken.

The facts in substance are as follows: On April 7, 1924, the city of Minneapolis adopted a zoning ordinance which provided:

"The City of Minneapolis is hereby divided into the five (5) districts aforesaid and *the boundaries of such districts are shown upon the map attached hereto and made a part of this ordinance, being designated as the Use District Map, and said map and all the notations, references, and other things shown thereon shall be as much a part of this ordinance as if the matters and things set forth by said map were all fully described herein."* (Italics supplied.)

Throughout the council proceedings relative to the adoption of this ordinance, a large map in various colors was used by the council to indicate the limitations of the various use zones under consideration. The scale of this map is 500 feet to the inch, and it shows streets, alleys, parks, and lakes, as well as actual lot lines in the various blocks and subdivisions, in addition to the zoned districts. All decisions of the council with reference to zoning are reflected thereon.

Plaintiff was then the owner of a large tract of land in use in its wholesale oil business near Franklin avenue southeast and Thornton street, in southeast Minneapolis. Included therein were the premises here in controversy, described as lots 20, 21, and 22, block 33, Meeker Island Land and Power Company's Addition. The colored map indicates that by virtue of the aforesaid ordinance all such property, including the above-described lots, was zoned for "light industrial" use.

At the time of the original council proceedings, a black and white map, with different symbols representing the various use districts, was prepared from the colored map. Its scale was 1,200 feet to the inch, so that lot lines, alleys, and other features indicated on the colored map could not be shown thereon. It was prepared for use in connection with the publication of the ordinance, since the colored map could not readily or economically be printed in the available newspapers. For some reason not clear, lots 20, 21, and 22, block 33, were indicated on the black and white map as zoned for "multiple dwelling" rather than "light industrial" use as established by the original ordinance and indicated on the colored map.

After the ordinance had been passed by the council and signed by the mayor, it and the colored map were delivered to the city clerk, who then placed the map in a metal container in his office, where it has since remained, except when in use. Publication of the ordinance, as required by charter, was then directed by the clerk, but for the reasons above set forth the black and white map, rather than the colored map, was actually published with the ordinance. In consequence, on the map published with the ordinance, the property above described was indicated as zoned for "multiple dwelling" use rather than for "light industrial" use.

Thereafter, the city planning commission by authority of the city council printed in pamphlet form for public distribution 10,000 exact copies of the published zoning ordinance and maps. These were made up from the plates used in publishing the original ordinance and maps and were distributed to members of the public.

In 1940, an official atlas of the city of Minneapolis prepared by authority of the city council was published with the zoning ordinance, including a reproduction of the published black and white map. This atlas is maintained as an official record in the city planning commission office, and several hundred copies thereof were distributed throughout the Minneapolis city hall and Hennepin county courthouse.

The disposition made of the black and white map after publication is unknown. The published ordinance with the black and white map as a part thereof, the affidavit of publication, as well as the original ordinance, have remained on file in the city clerk's office since such publication. The colored map has remained in use in the office of the city clerk, and copies thereof are likewise used in the office of the city building inspector and the city planning commission. The city and its officials have proceeded on the basis that the colored map was the official zoning map of the city.

In 1930, upon plaintiff's application and in reliance upon the colored map, the city issued a permit for the construction of the first story of a contemplated two-story office building on lots 20, 21, and 22, block 33, above described. Were such property zoned for multiple dwelling purposes only, the construction of such a building would have been unauthorized. The city building inspector was then informed that plaintiff contemplated the construction of its second floor at some future time. The original plans then submitted showed such second floor and included items not required for a one-story building. The expense paid by plaintiff at that time in preparation for such ultimate addition amounted to approximately $2,700. No objection to the issuance of the permit described was made by anyone at that time, and plaintiff proceeded to complete the one-story structure.

In January 1946, plaintiff applied to the building inspector for a permit to construct the second story of the building described. Again, after reference to the colored zoning map, the building inspector on January 21 issued the permit. Following its issuance and in reliance thereon, plaintiff entered into contracts, purchased

materials, incurred obligations, and made material alterations on the original building. Expenditures were made and liability incurred in excess of $12,000 in connection with the planned construction.

On February 8, 1946, the city council by resolution rescinded the permit issued on January 21 and directed the building inspector to notify plaintiff of its action. Shortly after receiving such notice plaintiff commenced these proceedings.

In September 1944, interveners claimed that the lots in question were zoned for "multiple dwelling" purposes only and directed the attention of the appropriate city officials to their contention in this respect. No action was taken thereon, and, as above related, the permit above described was later issued. Interveners took no action during all the time plaintiff was expending money and incurring expenses in connection with the contemplated construction.

On appeal, defendants and interveners contend (1) that the black and white rather than the colored map is the official zoning map of the city, and that the trial court erred in holding otherwise; and (2) that neither interveners nor defendants are estopped by their conduct herein, as the trial court determined.

■ The publication of the ordinance and the map was required by virtue of c. 4, § 9, of the Minneapolis city charter, which provides that before any ordinance shall be in force it shall be published in the official paper of the city. This requirement is mandatory, and it is clear that failure to comply therewith would render any ordinance ineffective. As stated in Basting v. City of Minneapolis, 112 Minn. 306, 308, 127 N. W. 1131, 140 A. S. R. 490:

"* * * The charter of the city provides that no ordinance enacted by the city council shall take effect until * * * it has been published by the city clerk in the manner prescribed. * * * The approval and publication were essential elements in the passage of the ordinance and a consummation or completion of the legislative power of enactment."

This rule is also expressed in Klotz v. Winona & St. P. R. Co. 68 Minn. 341, 351, 71 N. W. 257, 261:

"* * * Irrespective of any statute changing the rule, the burden is on the party introducing in evidence a by-law or ordinance of a city to prove the existence of everything necessary to the enactment of a valid by-law or ordinance. that is, its due passage and publication, where the latter is a condition precedent to its taking effect."

The rule making publication of an ordinance mandatory before it may take effect if charter provisions require such publication has been held to require publication of zoning maps made part of city zoning ordinances. See, Sherwin v. Erie (1937) 30 Pa. D. & C. 701; Katz v. Higson, 113 Conn. 776, 155 A. 507; Village of Durand v. Love, 254 Mich. 538, 236 N. W. 855; L. A. Thompson Scenic Ry. Co. v. McCabe, 211 Mich. 133, 178 N. W. 662. It is expressed in the Sherwin case as follows (30 Pa. D. & C. 705):

"While the requirements that the zoning map be published along with the body of the ordinance may work a hardship upon the defendants, the law clearly intends that the entire ordinance be published unless other provisions be made. Knowledge that a measure is pending by one whose rights may be affected by its enactment will not cure a defect of publication: * * * For this reason the failure to publish the ordinance in its entirety is fatal."

In the Village of Durand case, the same principle is expressed as follows (254 Mich. 540, 236 N. W. 856):

"* * * But Exhibit A was drafted solely for the purpose of the ordinance and to define the fire limits, had no prior official approval and had no purpose, use, force, or official sanction except as it was given by and as part of the ordinance. An ordinance cannot at the same time establish a paper as a public record and also incorporate it by reference as a previously established public record. Without publication of the map, the ordinance was not published in full, did not comply with the statute, and is void."

It is clear from the foregoing that the colored map, which was not published, is not the official zoning map of the city. It would likewise seem true that, except for M. S. A. 599.13, the black and white

map, which was not referred to at the time the ordinance was adopted, likewise could not be regarded as the official map.

■ No doubt to eliminate the confusion which might arise from situations of this kind where through error or omission parts of ordinances may have been altered in their publication, M. S. A. 599.13 was enacted. This section provides:

"Copies of the ordinances, by-laws, resolutions, and regulations of any city, village, or borough, certified by the mayor or president of the council, and the clerk thereof, under its seal, and copies of the same printed in any newspaper, book, pamphlet, or other form, and which purport to be published by authority of the council of such city or village, shall be prima facie evidence thereof and, *after three years from the compilation and publication of any such book or pamphlet, shall be conclusive proof of the regularity of their adoption and publication."* (Italics supplied.)

It is undisputed here that more than three years have elapsed since the newspaper publication of the ordinance with the black and white map attached, and the subsequent publication thereof in book and pamphlet form, as well as in the atlas above described. Unless the word "conclusive" as used in the foregoing statute can be construed in some manner other than in its ordinary meaning, it would seem that this statute must end argument in the matter and that thereunder, because of its publication as above described, the black and white map became the official zoning map of the city.

We have recently (State ex rel. City of St. Paul v. Oehler, 218 Minn. 290, 296, 16 N. W. [2d] 765, 768) expressed the rule that if the language employed in a statute "embodies a definite meaning, and involves no absurdity or contradiction, literal enforcement is required, the statute being 'its own best expositor;' * * *."

The word "conclusive" used in the foregoing statute has been construed at all times in accordance with its ordinary meaning. It has been held to mean "decisive" or "irrefutable"—an inference which the law makes so peremptory that it cannot be overcome by any contrary proof, however strong. Edwards v. Shreveport Creosoting

Co. 207 La. 699, 706, 21 So. (2d) 878, 880; Hobart v. Hobart Estate Co. 26 Cal. (2d) 412, 159 P. (2d) 958; State v. Brandenberger, 151 Iowa 197, 130 N. W. 1065; Joslyn v. Pulver, 66 N. Y. (Hun) 129, 13 N. Y. S. 311; Masterson v. Whipple, 27 R. I. 192, 61 A. 446; Cope v. State, 118 Tex. Cr. 232, 39 S. W. (2d) 891.

Applying the plain meaning of the words used in the foregoing statute to the undisputed facts here, we are compelled to conclude that the black and white map, which was actually published by proper authority as a part of the zoning ordinance, upon the expiration of three years from the date of its publication became the valid, effective, and official zoning map of the city. Since the property here involved is therein zoned for "multiple dwelling" use, it follows that the city officials were without authority to grant plaintiff the permit to construct on such property a building which, it is undisputed, was intended for "light industrial" use.

■ It is suggested that defendant city by its conduct prior to the cancellation of the permit here described was thereafter estopped from rescinding it. It is pointed out that plaintiff has undergone considerable expense and subjected itself to substantial liability in reliance upon the permit originally issued. It is argued that because thereof the city is estopped to change the position originally taken by it.

It has frequently been held that the acts of a municipality relative to the issuance of building permits under zoning ordinances for the construction of various types of commercial or industrial plants, as well as residential property, fall within its governmental rather than proprietary functions, and that in consequence estoppel will not lie against the municipality for acts performed in connection therewith. The Alexander Co. v. City of Owatonna, 222 Minn. 312, 24 N. W. (2d) 244; Edge v. City of Bellaire (Tex. Civ. App.) 200 S. W. (2d) 224; Matter of S. B. Garage Corp. v. Murdock, 185 Misc. 55, 55 N. Y. S. (2d) 456; Robinson v. City of Dallas (Tex. Civ. App.) 193 S. W. (2d) 821. This rule has most recently found expression in this court in The Alexander Co. case as follows (222 Minn. 320, 24 N. W. [2d] 249):

"The city engineer, then, being without authority to grant the permit which he gave plaintiffs, we are faced with the question whether the city is estopped to deny the authority of the engineer to issue the permit. We hold that the city is not estopped to deny such authority. The function here involved was governmental and not proprietary in nature. The general rule applicable in such a situation is stated in 2 Dunnell, Dig. & Supp. § 3211, as follows:

" 'The doctrine of estoppel applies to the state acting in its proprietary capacity, but not when it acts in its sovereign or political or governmental capacity. The state is not estopped by the unauthorized acts or omissions of its officers or agents. The same principles apply to municipalities.' (Citing cases.)

"A contrary rule would lead to chaos in municipal affairs. If the doctrine of estoppel could be invoked in such situations, municipalities would repeatedly find themselves bound by the unauthorized acts of officers and agents possessing only limited authority. Experience has shown the wisdom of the prevailing rule that persons dealing with municipal officers and agents are bound by constructive notice of the law and public records with respect to the powers and functions of such officers or agents."

The foregoing doctrine has been applied in many cases where the evidence established without question that the complaining party had suffered financial loss in reliance upon the acts of the municipal corporation against which estoppel was asserted. The Alexander Co. v. City of Owatonna, 222 Minn. 312, 24 N. W. (2d) 244; Edge v. City of Bellaire (Tex. Civ. App.) 200 S. W. (2d) 224; Matter of S. B. Garage Corp. v. Murdock, 185 Misc. 55, 55 N. Y. S. (2d) 456; Robinson v. City of Dallas (Tex. Civ. App.) 193 S. W. (2d) 821; City of Amarillo v. Stapf, 129 Tex. 81, 101 S. W. (2d) 229.

Under the authorities above cited, it follows that the city was not estopped from subsequently revoking the permit issued by it in violation of such zoning ordinances, since the acts of the city officials involved governmental functions and were in contravention of the city ordinances and in conflict with the black and white map, which

we have determined is the official zoning map of the city.

Reversed.

FRANK T. GALLAGHER, JUSTICE (dissenting).

It appears to me that under the particular facts and circumstances of this case the municipality should be estopped from rescinding the building permit issued to plaintiff January 21, 1946, and that the latter should at least be permitted to complete the building as planned.

Here, we have a situation where the municipality, as early as 1930, about six years after the zoning ordinance was passed, issued a permit for the construction of the first story of a planned two-story office building. At that time, according to the record, the building inspector was informed that plaintiff contemplated the completion of the building by erecting a second story at some future time. The original plans were prepared at an extra expense of about $2,700 for a second story and included some items which would not have been necessary for a one-story building. Throughout the council proceedings in connection with the adoption of the zoning ordinance, the large colored map was used to indicate the limitations of the different use zones. This map showed plaintiff's lots, referred to in these proceedings, to be in the "light industrial" zone. Thereafter, it appears that the colored map remained in use in the office of the city clerk, copies of it were used for reference purposes in the offices of the city building inspector and the city planning commission, and it was considered by the city officers as the official zoning map of the city. After the permit was issued to plaintiff on January 21, 1946, to complete the building and before it was rescinded the following month, plaintiff, relying upon the January permit, expended in excess of $12,000 in preparation for the completion of the building, by entering into contracts, purchasing materials, and making alterations on the original building. It seems to me that under these circumstances February 8, 1946, was a late date for the municipality to rescind the permit.

I cannot agree with the ruling of a divided court in the case of The Alexander Co. v. City of Owatonna, 222 Minn. 312, 24 N. W. (2d)

244, as applicable in this case. In that case, it was held that the city was not estopped to deny the authority of the city engineer in issuing the permit, on the theory that the function there involved was governmental and not proprietary in nature. In that case, plaintiff applied to the city engineer on April 12, 1944, for permission to make the planned alterations of the building and construct a proposed driveway over the sidewalk, including the cutting of the curb. The engineer suggested certain changes in the plans, which were complied with, and then told the company it could go ahead with the work, including the cutting of the curb. After the alterations to the building had been completed early in June 1944 and when the work of constructing the driveway and cutting the curb was in process, a member of the city council observed the work being done and objected on the ground that it was being done without authority of the council. The work was then stopped, and hearings were held in the matter, at which times certain citizens objected to the driveway and curb-cutting on the ground that the proposed driveway would constitute a serious traffic hazard. On July 18, 1944, the council, by a vote of four to three, denied the application for the permit.

In the instant case, it is conceded that in 1930 plaintiff was issued a permit to construct the first story of the building, at which time the building inspector relied on the colored map, which showed plaintiff's property in the "light industrial" zone. About 16 years afterward, in January 1946, still relying on the colored map, the building inspector again issued a permit to complete the second story, even though in September 1944, according to the majority opinion, interveners directed the attention of the appropriate city officials to their contention that plaintiff's property was in the "multiple dwelling" zone, but no action was taken by the municipality in the matter. For these reasons, I cannot concur with the majority holding on the question of estoppel of the municipality.

PETERSON, JUSTICE (dissenting).

I concur in the dissent.

Mr. Justice Matson took no part in the consideration or decision of this case.