CHARLES A. HAYWARD AND WINIFRED J. HAYWARD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MAX E. HAYWARD AND EDNA L. HAYWARD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 73960, 74003. Filed October 25, 1961.

*Dean S. Butler, Esq.*, for the petitioners.

*Thomas F. Greaves, Esq.*, and *Jack E. Roberts, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies for 1952 as follows:

| Petitioners | Docket No. | Deficiency |
|---|---|---|
| Charles A. Hayward and Winifred J. Hayward | 73960 | $632.52 |
| Max E. Hayward and Edna L. Hayward | 74003 | 5,731.31 |

The National Enforcement Commission of the Economic Stabiliza-

tion Agency disallowed certain expenses of a limited partnership of which petitioners Charles A. Hayward and Max E. Hayward were the two general partners and, in its certificate of disallowance, allocated this amount among all the partners.

The issues presented are:

(1) Whether such allocation is binding on respondent under the provisions of the Defense Production Act of 1950, as amended, and related Executive orders and regulations;

(2) If not, whether respondent is collaterally estopped from asserting a position in conflict with such allocation; and

(3) If not, what the proper allocation is.

With respect to petitioner Max E. Hayward, the Commissioner also determined that an amount of $250 should be reflected as additional income by reason of his personal use of an automobile furnished him by a corporation of which he was an officer. This item is conceded by that petitioner.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioners Max E. Hayward (hereinafter sometimes referred to as Max) and Edna L. Hayward, husband and wife, and petitioners Charles A. Hayward (hereinafter sometimes referred to as Charles) and Winifred J. Hayward, husband and wife, filed timely joint income tax returns on a cash basis for the calendar year 1952 with the district director of internal revenue, Los Angeles, California.

The two wives are joined as petitioners herein solely because they filed joint returns with their husbands. The husbands, Charles and Max, are hereinafter sometimes referred to as petitioners.

Petitioners were the general partners in Hayward Precision Products Company (hereinafter sometimes referred to as Company), a limited partnership organized on February 1, 1952, and dissolved on December 31, 1952. Company was created under the laws of the State of California for the purpose of continuing the machine tool and die manufacturing business carried on during the prior year by another partnership of the same name.

Company commenced business operations with $100,000 of capital contributed to it by its member partners. Its capital account was increased to $125,000 on July 1, 1952, by an instrument entitled "Amendment to Limited Partnership Agreement," in which the capital account of one of the limited partners—the Nancy M. Hayward Trust #2—was increased by $25,000, that is, from $23,000 to $48,000.

The partners in Company, who remained unchanged during the year, their status as general or limited partners, also unchanged during the year, and their respective capital contributions, unchanged

during the year except for the Nancy M. Hayward Trust #2 were as follows:

| Status | Capital contribution |
|---|---|
| General partners: | |
| Max E. Hayward | $12,000 |
| Charles A. Hayward | 4,000 |
| Limited partners: | |
| Nancy M. Hayward Trust #2 | 48,000 |
| Ruby Jane Hayward Trust #2 | 19,000 |
| Kirk Wesley Hayward Trust #1 | 12,000 |
| Jane Kimberly Hayward Trust #1 | 11,000 |
| Walter Thomas Jorgensen Trust #1 | 10,000 |
| Andrea Jane Jorgensen Trust #1 | 9,000 |

Both the limited partnership agreement of February 1, 1952, and the amendment of July 1, 1952, contain the following language as part of their respective paragraphs IV:

The net profits and losses shall be divided between and borne by the partners in proportion to their capital contributions; provided, however, that when the losses chargeable against any Limited Partner shall equal the amount of capital contributed by said Limited Partner, the Limited Partner shall not be liable for any losses in excess of such amount, and any such excess of loss shall be borne by the General Partners. * * *

Company maintained its books of account on the accrual basis. In its partnership information return for the year ending December 31, 1952, it reported the amount of $206,046.41 as an ordinary net loss.

This ordinary net loss was allocated among all the partners in accordance with the profit- and loss-sharing provisions of paragraph IV of the partnership agreement, and is contained in a schedule attached to Company's income tax information return for the taxable year ending December 31, 1952. The pertinent parts of this schedule follow:

| | Percent of ownership | Capital account at beginning of year | Ordinary net income | Capital account at end of year |
|---|---|---|---|---|
| Max E. Hayward (general partner) | 12/125 | $12,000 | ($72,784.81) | ($60,748.81) |
| Charles A. Hayward (general partner) | 4/125 | 4,000 | (24,261.60) | (20,261.60) |
| Ruby Jane Hayward Trust #2 (limited partner) | 19/125 | 19,000 | (19,000.00) | -0- |
| Nancy McClaine Hayward Trust #2 (limited partner) | 48/125 | 48,000 | (48,000.00) | -0- |
| Kirk Wesley Hayward Trust #1 (limited partner) | 12/125 | 12,000 | (12,000.00) | -0- |
| Jane Kimberly Hayward Trust #1 (limited partner) | 11/125 | 11,000 | (11,000.00) | -0- |
| Walter Thomas Jorgensen Trust #1 (limited partner) | 10/125 | 10,000 | (10,000.00) | -0- |
| Andrea Jane Jorgensen Trust #1 (limited partner) | 9/125 | 9,000 | (9,000.00) | -0- |
| | | 125,000 | (206,046.41) | (81,046.41) |

Max and Charles reported the respective amounts of $72,784.81 and $24,261.60 as a partnership loss on their respective 1952 joint income tax returns and all the above-named limited partners also reported the above-noted respective amounts as a partnership loss on the respective fiduciary income tax returns for 1952.

On or about September 9, 1953, respondent received from the National Enforcement Commission (hereinafter sometimes referred to as N.E.C.) of the Economic Stabilization Agency a certificate of disallowance, which provided as follows:

### CERTIFICATE OF DISALLOWANCE

TO: THE COMMISSIONER OF INTERNAL REVENUE
Washington, D.C.

Pursuant to the Defense Production Act, as amended (Public Law 774, 81st Congress; Public Law 96, 82nd Congress); Executive Order 10161 (15 F.R. 6105); Economic Stabilization Administration General Order No. 18 (18 F.R. 6295); and National Enforcement Commission Procedural Regulation No. 1, Revised (17 F.R. 7737), the National Enforcement Commission hereby certifies that: HAYWARD PRECISION PRODUCTS COMPANY whose address is 66 Hawthorne Street—Glendale 4, California has been found to have made payments in contravention of the Defense Production Act, as amended, and the regulations of the Wage Stabilization Board, Economic Stabilization Agency issued thereunder.

For the purpose of calculating the deductions of the partnership in its federal income tax information return, the sum of $22,638.00 shall be disregarded for the partnership's taxable year ending December 31, 1952, and said deduction shall be charged therein against the income of the partners, *Max E. Hayward; Charles A. Hayward; Andrea K. Hayward, Max E. Hayward & Leo E. Hubbard as Trustees for Nancy M. Hayward; Jane H. Jorgensen, Andrea K. Hayward, Max E. Hayward & Leo E. Hubbard as Trustees for Ruby Jane Hayward; Jane H. Jorgensen, William C. Hayward & Walter E. Jorgensen as Trustees for Kirk Wesley Hayward; Jane H. Jorgensen, William C. Hayward & Walter E. Jorgensen as Trustees for Jane Kimberly Hayward; Robert D. Hayward, William C. Hayward & Alfred V. Jorgensen as Trustees for Walter Thomas Jorgensen; Robert D. Hayward, William C. Hayward & Alfred V. Jorgensen as Trustees for Andrea Jane Jorgensen*, respectively, from the said partnership for the said taxable year in the proportion of their respective partnership interests, which are as follows: *Max E. Hayward* (1/10 *interest—$2,173.25*); (2) *Charles A. Hayward* (1/30 *interest—$734.42*); (3) *Andrea K. Hayward, Max E. Hayward & Leo E. Hubbard as Trustees for Nancy M. Hayward Trust #2*, (1/8 *interest— $8,682.98*); (4) *Jane H. Jorgensen, Andrea K. Hayward, Max E. Hayward & Leo E. Hubbard as Trustees for Ruby Jane Hayward Trust #2* (1/6 *interest— $3,440.98*); (5) *Jane H. Jorgensen, William C. Hayward & Walter E. Jorgensen as Trustees for Kirk Wesley Hayward Trust #1* (1/10 *interest—$2,173.25*); (6) *Jane H. Jorgensen, William C. Hayward & Walter E. Jorgensen as Trustees for Jane Kimberly Hayward Trust #1* (1/11 *interest—$1,992.14*); (7) *Robert D. Hayward, William C. Hayward & Alfred V. Jorgensen as Trustees for Walter Thomas Jorgensen, Trust #1* (1/12 *interest—$1,811.04*); (8) *Robert D. Hayward, William C. Hayward & Alfred V. Jorgensen as Trustees for Andrea Jane Jorgensen Trust #1* (1/12 *interest—$1,629.94*). [Emphasis in original.]

In his statutory notice, dated March 24, 1958, respondent explained his adjustment of Charles' income as follows:

(a) Examination of the books of the partnership, Hayward Precision Products Co., discloses that your share of the distributable net loss for the year February 1 to December 31, 1952 is $18,602.10. Inasmuch as you reported a net loss of $24,261.60, your taxable income is increased $5,659.50, computed as follows:

| | |
|---|---|
| Ordinary net loss per partnership return | ($206,046.41) |
| Add: Wages paid in contravention of the Defense Production Act of 1950 (64 Stat 798) | 22,638.00 |
| Ordinary net loss as corrected | (183,408.41) |
| Your distributable share | (18,602.10) |
| Partnership net loss reported on your return | (24,261.60) |
| Overstatement of partnership net loss | 5,659.50 |

In his statutory notice, dated March 24, 1958, respondent explained his adjustment of Max's income as follows:

(a) Examination of the books of the partnership, Hayward Precision Products Co., discloses that your share of the distributable net loss for the year February 1 to December 31, 1952 is $55,806.31. Inasmuch as you reported a net loss of $72,784.81, your taxable income is increased $16,978.50, computed as follows:

| | |
|---|---|
| Ordinary net loss per partnership return | ($206,046.41) |
| Add: Wages paid in contravention of the Defense Production Act of 1950 (64 Stat 798) | 22,638.00 |
| Ordinary net loss as corrected | (183,408.41) |
| Your distributable share | (55,806.31) |
| Partnership net loss reported on your return | (72,784.81) |
| Overstatement of partnership net loss | 16,978.50 |

## OPINION.

Petitioners contend that the N.E.C.'s determinations are binding on respondent. Respondent maintains that the N.E.C.'s power ends when it determines the amount to be disallowed—it has no power to allocate this amount among the partners in a partnership. Petitioners reply that the N.E.C. has the power to allocate and that the entire certificate of disallowance, including the allocation, is binding on respondent.

We agree with petitioners.

In response to the emergency created by the onset of war in Korea on June 25, 1950, Congress quickly enacted the Defense Production Act of 1950.[1] Congress found that production levels must be expanded at once with maximum effectiveness and the least hardship. It provided in the Act that:

---

[1] Act of September 8, 1950, ch. 932, 64 Stat. 798, 50 U.S.C. App. sec. 2061 *et seq.*

Sec. 2. [50 U.S.C. App. sec. 2062] * * * It is the objective of this Act to provide the President with authority to accomplish these adjustments in the operation of the economy. *It is the intention of the Congress that the President shall use the powers conferred by this Act to promote the national defense,* by meeting, promptly and effectively, the requirements of military programs in support of our national security and foreign policy objectives, and *by preventing undue strains and dislocations upon wages, prices,* and production or distribution of materials for civilian use, within the framework, as far as practicable, of the American system of competitive enterprise. [Emphasis supplied.]

The purpose of title IV of the Act, Price and Wage Stabilization, was stated to be, in part, as follows:

Sec. 401. [50 U.S.C. App. sec. 2101] *It is the intent of Congress to provide authority necessary to achieve the following purposes in order to promote the national defense: To prevent inflation and preserve the value of the national currency; to assure that defense appropriations are not dissipated by excessive costs and prices;* to stabilize the cost of living for workers and other consumers and the costs of production for farmers and businessmen; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities; to protect consumers, wage earners, investors, and persons with relatively fixed or limited incomes from undue impairment of their living standards; to prevent economic disturbances, labor disputes, interferences with the effective mobilization of national resources, and impairment of national unity and morale; to assist in maintaining a reasonable balance between purchasing power and the supply of consumer goods and services; to protect the national economy against future loss of needed purchasing power by the present dissipation of individual savings; and to prevent a future collapse of values. *It is the intent of Congress that the authority conferred by this title shall be exercised in accordance with the policies set forth in section 2 of this Act,* and in particular with full consideration and emphasis, so far as practicable, on the maintenance and furtherance of the American system of competitive enterprise, including independent small-business enterprises, the maintenance and the furtherance of a sound agricultural industry, the maintenance and furtherance of sound working relations, including collective bargaining, and the maintenance and furtherance of the American way of life. *Whenever the authority granted by this title is exercised, all agencies of the Government dealing with the subject matter of this title, within the limits of their authority and jurisdiction, shall cooperate in carrying out these purposes.* [Emphasis supplied.]

Section 405(b) of the Act, as amended, gave the President specific authority to determine the extent to which wage, salary, and other payments in violation of title IV or any regulations issued thereunder were to be disregarded in determining costs or expenses for any purpose.[2]

---

[2] SEC. 405. [50 U.S.C. App. sec. 2105]

(b) No employer shall pay, and no employee shall receive, any wage, salary or other compensation in contravention of any regulation or order promulgated by the President under this title. [Title IV of the Act.] *The President shall also prescribe the extent to which any wage, salary, or compensation payment made in contravention of any such regulation or order shall be disregarded by the executive departments and other governmental agencies in determining the costs or expenses of any employer for the purposes of any other law or regulation.* [Emphasis supplied.]

Section 703 (a) authorized creation of agencies and delegation and redelegation of the President's powers.[3] The President's rule-making power was set forth broadly in section 704.[4]

The power thus granted was exercised by the President in part by creating the Economic Stabilization Agency, headed by the Economic Stabilization Administrator,[5] and delegating to him, with exceptions not here relevant, all the President's powers under the Act,[6] including authority to redelegate power[7] and to create agencies.[8]

The Economic Stabilization Agency in turn created the National Enforcement Commission[9] and delegated authority to it—

to determine whether any wage, salary, or other compensation has been paid or accrued, at any time, in violation of any provision of the Defense Production Act of 1950, as amended, or any regulation or order or directive heretofore or hereafter promulgated under the act, or any regulation or order or directive heretofore or hereafter promulgated into the act, and further to determine the amount of payments or accruals to be disregarded and disallowed for the purposes enumerated in section 4(a) below. * * * Extenuating and mitigating circumstances of the character described in section 4(b) may be considered in determining the amount to be disallowed and disregarded.[10]

Section 4 of Economic Stabilization Agency General Order 15 authorized disallowance of payments for purposes of the "Revenue Laws" and set forth criteria for leniency in treatment.[11]

---

[3] Sec. 703. [50 U.S.C. App. sec. 2153] (a) Except as otherwise specifically provided, the President may delegate any power or authority conferred upon him by this Act to any officer or agency of the Government, including any new agency or agencies (and the President is hereby authorized to create such new agencies, other than corporate agencies, as he deems necessary), and he may authorize such redelegations by that officer or agency as the President may deem appropriate.

[4] Sec. 704. [50 U.S.C. App. sec. 2154] The President may make such rules, regulations, and orders as he deems necessary or appropriate to carry out the provisions of this Act. Any regulation or order under this Act may be established in such form and manner, may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions as in the judgment of the President are necessary or proper to effectuate the purposes of this Act, or to prevent circumvention or evasion, or to facilitate enforcement of this Act, or any rule, regulation, or order issued under this Act.

[5] Exec. Order No. 10161, 15 Fed. Reg. 6105, 6106, sec. 401(a) (1950).

[6] Id. at 6106, 6107, secs. 401(c), 902(a).

[7] Id. at 6107, sec. 902(b)(1).

[8] Id. sec. 902(b)(2).

[9] Economic Stabilization Agency General Order 18, July 28, 1952, 17 Fed. Reg. 6925.

[10] Economic Stabilization Agency General Order 15, April 3, 1952, 17 Fed. Reg. 2994, 2995, sec. 3, as amended by Amdt. 1, Nov. 5, 1952, 17 Fed. Reg. 9977.

[11] 17 Fed. Reg. 2995 as amended at 17 Fed. Reg. 9977:

Sec. 4. *Disallowance policy*—(a) *Purposes of disallowance. The disallowances* under the authority granted by sections 2 and 3 *may be made for one or more of the purposes of:*

(1) *Calculating deductions or the basis for determining gain under the Revenue Laws of the United States;*

(2) Determining costs and expenses under any contract made by or on behalf of the United States, either directly or indirectly;

(3) Establishing any maximum price pursuant to the act; and

(4) Determining the costs or expenses of any person for the purpose of any other law or regulation, whether heretofore or hereafter promulgated.

(b) *Amounts of disallowance and extenuating circumstances.* (1) The amount paid or accrued in violation of the act or regulations, orders or determinations made thereunder which may be disallowed and disregarded shall be the entire amount of the wage, salary or other compensation paid or accrued, or the entire amount of the payment either in

The N.E.C.'s General Procedural Regulation No. 1, revised August 21, 1952, 17 Fed. Reg. 7737, issued by the Economic Stabilization Administrator, provided, in relevant part, as follows:

Section 1.1 *Enforcement proceedings.*—Whenever it has been determined that any wage, salary, or other compensation has been paid in contravention of the regulations and orders issued or promulgated under the act, the extent to which any such wage, salary, or other compensation payment shall be disregarded by the executive departments and other governmental agencies in determining the costs or expenses of any employer for the purposes of any other law or regulation shall be prescribed in accordance with the provisions of Section 405(b) of the act. *Any wage, salary, or other compensation paid in contravention of the regulations and orders issued or promulgated under the act may be disallowed in whole or in part for one or more of the following purposes:*

(a) *Calculating deductions or the basis for determining gain under the Revenue Laws of the United States;*

(b) Determining costs and expenses under any contract made by or on behalf of the United States, either directly or indirectly;

(c) Establishing any maximum price pursuant to the act; and

(d) Determining the costs or expenses of any person for the purpose of any other law or regulation.

\* \* \* \* \* \* \*

Section 2.1 *Complaint.*—(a) Whenever it appears to the Office of Salary Stabilization, the Wage Stabilization Board, or the Railroad and Airline Wage Board that any person has contravened the Act or any regulation or order issued or promulgated pursuant thereto by the Economic Stabilization Administrator or by any such Board or office and that an enforcement proceeding in respect thereto should be instituted before the National Enforcement Commission or the Commission's designee, it shall issue a complaint and cause the original thereof and one copy to be filed with the National Enforcement Commission, in Washington, D.C., and copies to be served upon all the parties. *Where the respondent is a partnership, service must be made upon each individual partner against whose interest in such partnership it is intended to request the imposition of a sanction.*

\* \* \* \* \* \* \*

Section 6.1 *Certificate of disallowance.*—Whenever there has been a final decision in an enforcement proceeding imposing a disallowance sanction, as defined in section 1.1 of this regulation, the National Enforcement Commission shall issue a Certificate of Disallowance setting forth the name and address of the respondent or respondents and the amount which shall be disallowed

---

money or property or other consideration, and not merely the amount paid or accrued in excess of the legal maximum of such wage, salary, other compensation, or payment. Where extenuating and mitigating circumstances exist, of the character described in the following paragraph, less than the entire amount of such payments or accruals may be disregarded and disallowed; provided that the usual and general policy shall be to disallow an amount at least equal to that portion of any payment or accrual in excess of whatever payment was permissible under the governing regulation, order or determination.

(2) Extenuating and mitigating circumstances which may be taken into account include:

(i) Prompt and voluntary disclosure of possible violation;

(ii) Prompt and full cooperation with investigating and other officials;

(iii) Prompt remedying of violation of applicable rules, regulations or orders;

(iv) The adoption of prompt and adequate measures to prevent repetition of any violation of applicable rules, regulations, or orders;

(v) Inadvertent rather than intentional and willful violations;

(vi) Such other factors as may be appropriate in the particular case.

[Emphasis supplied.]

and disregarded by any Executive Department or other agency or departments or agencies of the government in determining the costs and expense of the respondent. The certificate of disallowance shall be transmitted by the National Enforcement Commission to the appropriate Executive Departments or other agencies of the government and a copy served upon the appropriate board or office and the respondent. *The certificate of disallowance shall be conclusive for the purposes stated therein.* [Emphasis supplied.]

Respondent concedes that, on September 9, 1953, the National Enforcement Commission had power to issue a binding certificate of disallowance.[12]

The Congress, the President, and the Economic Stabilization Agency clearly intended to grant broad powers, ultimately (on the issue here) to the N.E.C. to make disallowance determinations which "shall be conclusive on all Executive Departments and agencies of the Government." [13]

Respondent concedes that the N.E.C.'s determination concludes him as to the decrease of the net operating loss reported by Company on its partnership information return. We find no warrant for holding that the Congress, the President, or the Economic Stabilization Agency intended to differentiate between the N.E.C.'s power to issue conclusive determinations with respect to partnerships and its power with respect to partners.

Congress provided the President and the agencies serving under him with a variety of weapons to enforce the wage and price regulations promulgated under the Defense Production Act of 1950. Among the weapons so provided (sec. 409) were injunctive procedures (sec. 409(a)), fine and imprisonment (sec. 409(b)), recovery of treble the amount of overcharges (sec. 409(c)), and disallowance of fines and overcharge recovery payments "in determining the costs or expenses of any such person for the purposes of any other law or regulation." Sec. 409(d).

The disallowance powers authorized by section 405 of the Act, as implemented by the Executive order and regulations set forth above, gave to the Economic Stabilization Agency and the N.E.C. an additional powerful weapon to secure compliance with and punish violation of the price and wage stabilization regulations authorized by the Act. To this end the N.E.C. has the conceded power to bind the Commissioner of Internal Revenue to at least certain types of N.E.C. decisions. Thereby the N.E.C. has the conceded

---

[12] Title IV of the Defense Production Act of 1950 expired on April 30, 1953 (sec. 717(a), as amended), but sec. 717(b)(3), as amended, provided that "Any agency created under this Act may be continued in existence for purposes of liquidation for not to exceed 6 months after termination of the provision authorizing the creation of such agency." See *Allen* v. *Grand Cent. Aircraft Co.*, 347 U.S. 535, 537 (1954).

[13] Economic Stabilization Agency General Order 15, sec. 6, *supra*.

power to employ the revenue laws to achieve the purposes of the Defense Production Act of 1950.[14]

Sections 3 and 4(a)(1) of the Economic Stabilization Agency General Order No. 15, *supra*, authorized the N.E.C. to disallow amounts for the purpose of determining deductions under the revenue laws. Partnerships do no more than file information returns under those laws—deductions (and income items) are of no significance except to the extent they are aggregated and then allocated among the partners.[15] Consequently a determination of the N.E.C. with respect to a partnership is of no significance until it has been allocated among the partners.

In effectuating the purposes of the Defense Production Act of 1950, the N.E.C. is concededly authorized to issue certificates of disallowance with regard to other taxpayers which apply directly and definitively to those taxpayers. We would create an inconsistency of treatment were we to agree with respondent that, in the case of partners, the N.E.C. is powerless to make directly effective definitive determinations. The language of the Act and its related executive orders and regulations do not require this inconsistency. We find no intent to create such an inconsistency of treatment.

The mitigation provisions of Economic Stabilization Agency General Order 15, section 4(b), *supra*, indicate an intention to confer both power and discretion upon the N.E.C. in its use of disallowances for the purposes authorized in section 4(a) of that general order. This grant of discretion indicates an intention that the N.E.C. should be allowed great leeway in its efforts to "make the punishment fit the crime" and thereby encourage obedience to the regulations sought to be enforced.[16] This authority to "fine-tune" punishments by selecting both the amounts to be disallowed and the purposes for which the disallowances are to be effective argues strongly against the respondent's position that there was an unexpressed intention to limit the N.E.C.'s powers with respect to partners.

---

[14] See *N. A. Woodworth Co.* v. *Kavanagh*, 102 F. Supp. 9, 13 (E.D. Mich. 1952), affirmed per curiam 202 F. 2d 154 (C.A. 6, 1953) :

"A reading of Section 5(a) of the Act [Wage Stabilization Act of 1942] discloses that the power to prescribe the extent to which an unlawful payment of wages or salaries shall be disregarded by other executive agencies was given by Congress in order to implement the mandate set forth in that section." Section 405(b) of the Defense Production Act of 1950 is an almost word-for-word reenactment of section 5(a) of the 1942 Act (50 U.S.C. App. sec. 965(a)) and has been so characterized and treated by the Supreme Court in its unanimous decision in *Allen* v. *Grand Cent. Aircraft Co.*, *supra* at 541. See S. Rept. No. 2250, 81st Cong., 2d Sess., p. 39, similarly describing section 405(b) of the 1950 Act.

See *Oak Mfg. Co.* v. *United States*, 193 F. Supp. 514, 519 (N.D. Ill. 1961), referring to a N.E.C. disallowance for income tax purposes as a "permissible sanction."

[15] I.R.C. 1939, secs. 181, 182, 183, 187, and 189.

The fact that partners are the real parties at interest when a partnership is before the N.E.C. is recognized in section 2.1 of its regulations, set forth above.

[16] See the last sentence of section 405(b) of the Defense Production Act of 1950, *supra*.

Respondent "admits that he is bound to carry out the purposes of Title IV of the Defense Production Act of 1950 * * * as set forth under Section 401 thereof." We conclude that the N.E.C., which has the power to make determinations affecting income taxes in order to achieve Congress' purposes under the Economic Stabilization Act of 1952, has authority to make definitive determinations directly with regard to partners and may do so by allocating among partners the disallowances it determines with regard to their partnerships. Respondent is concluded by such allocation even as he is concluded by any other disallowance determined by the N.E.C. pursuant to authority granted it.

Respondent also argues that he is not bound by the allocation in the certificate of disallowance because it is wrong, i.e., it conflicts with the allocation provisions of the partnership agreement and it does not conform to proper accounting principles.[17] Respondent misconceives the effect of the statutory and regulatory provisions here relevant.

A statute is not necessary in order to bind one to a correct determination. If respondent concedes the correctness of a determination, he is in effect bound by his concession. If he contests a determination and the court rules it was correct, then he is bound by the court's decision. The purpose of the statutory and regulatory provisions here relevant is to bind respondent to the N.E.C.'s determination even if that determination is not correct.

An example of the effect of such a provision may be found in the Small Business Act (title II of the Act of July 30, 1953, ch. 282, 67 Stat. 232), as revised by the Act of July 18, 1958, Pub. L. 85–536, 72 Stat. 384. Paragraphs (6) and (7) of section 8(b) of the 1958 revision (15 U.S.C. sec. 637(b)(6 and 7)) require procurement officers and certain others to "accept as conclusive" any certificate issued by the Small Business Administration that a concern is a "small-business concern" under that Act and that it is competent "as to capacity and credit * * * to perform a specific Government contract." The Comptroller General has held that a Small Business Administration certificate of competency issued pursuant to section 8(b)(7) bound a Department of the Army contracting officer despite a determination by the Contractor Evaluation Board of the Signal Supply Agency, concurred in by the contracting officer, that that firm was not in fact competent to handle that contract. B–139366, 38 Comp. Gen. 864 (June 24, 1959). See B–145644, p. 3 (May 26, 1961), for a similar

---

[17] We are not here called upon to decide whether taxpayers may appeal from the disallowance to us or any other court (see *N. A. Woodworth Co.* v. *Kavanagh, supra; Oak Mfg. Co.* v. *United States, supra*), since petitioners in this proceeding do not seek a redetermination of either the entire amount disallowed or the allocation of this amount among the partners.

statement as to the effect of the predecessor provisions (secs. 212(d) and 213) see B–135444, 37 Comp. Gen. 676, 678 (Apr. 14, 1958).

Another illustration of the significance of being bound by a determination without regard to its correctness may be found in *Sweet* v. *Commissioner*, 120 F. 2d 77 (C.A. 1, 1941), motion for leave to file petition for rehearing denied 313 U.S. 600 (1941), where the Circuit Court of Appeals for the First Circuit refused to reopen a case decided by this Court and affirmed by the circuit court even though it was conceded that a later Supreme Court decision had interpreted a comparable tax law provision "in a manner which we may assume to be in square conflict with the interpretation we put upon § 23(r) of the Act of 1932." The earlier decision derived its force from the finality accorded court decisions when appeal procedures have been exhausted and not from the correctness of the decision.

*W. H. Barber Co.* v. *City of Minneapolis*, 227 Minn. 77, 34 N.W. 2d 710 (1948), involved a zoning ordinance adopted in 1924. The ordinance was passed in contemplation of and incorporated by reference a large map which showed the permissible uses for every lot in the city. On this map, three lots involved in the *Barber* case were zoned for "light industrial" use. The ordinance was then published together with a smaller map which showed those lots zoned for "multiple dwelling" use. Copies of the original large map were used by various city officials, including those involved in the *Barber* case. The Minneapolis city charter provided that ordinances would not be effective until they were published. A Minnesota statute provided that 3 years after the official publication of any ordinances, such published copies "shall be conclusive proof of the regularity of their adoption and publication." In a suit to have adjudged valid a building permit issued on the basis of the zoning shown by the large map, but then rescinded by the city council, the Minnesota Supreme Court held that all parties were precluded from disputing the accuracy of the zoning shown by the small, published map. This was so despite the court's conviction that the small map was in fact inaccurate, that municipal agencies for a score of years had acted on the basis that the large map correctly reflected the law, that appropriate municipal officials had issued the building permit before the court on the basis of the large map's accuracy more than a year after the discrepancy had been brought to their attention, and that the plaintiff had expended or incurred liabilities in excess of $12,000 in reliance on the validity of the permit. By virtue of the conclusive force given by the statute to the published version of the ordinance, all persons were bound by that form even though it was incorrect.

Our conclusion that respondent is bound by the allocation in the certificate of disallowance makes it unnecessary to decide whether

respondent is collaterally estopped to deny that the allocation made by the National Enforcement Commission is correct, and we also do not decide whether the allocation conforms to the partnership agreement or to proper accounting principles.

Because petitioners concede that the certificate of disallowance has the effect of reducing their net operating loss for tax purposes below the amounts claimed by them in their returns for the year before this Court and because Max concedes the propriety of another adjustment made by respondent,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

_____

RAUM, *J.*, dissenting: The effect of the Court's decision is to permit the petitioners to receive the tax benefit of a much greater share of the partnership's losses than they were chargeable with under the partnership agreement after the determination of the National Enforcement Commission. Thus, while purportedly upholding the N.E.C. determination, the majority opinion sanctions an outcome that makes the N.E.C. determination largely self-defeating. This result might be acceptable if it were required by that determination, the applicable Defense Production Act of 1950, and the Executive order, general order, and regulations promulgated pursuant to that Act. However, I am convinced that this result is not so required.

While I am in agreement with that portion of the majority opinion which holds the N.E.C.'s certificate of disallowance binding upon the respondent, even as to the allocation among the partners involved, that is not the end of the matter. Contrary to the prevailing opinion, I think that the respondent's determination is consistent with the N.E.C.'s order and that petitioners are entitled to no such windfall as is accorded to them here.

As set forth in the findings, the partnership agreement provided that the partnership's net losses should be borne by the partners in proportion to their capital contributions, except that the limited partners should be liable for losses *only to the extent of their capital contributions* and the general partners (the present petitioners) should be chargeable with any excess. Pursuant to this agreed formula and prior to the determination of the N.E.C., the partnership's net losses for 1952 were divided so that the limited partners were each charged with an amount of loss equal to his or her capital account and the petitioners' accounts were charged with the sizable excess of $81,046.41 over and above their own capital accounts. However, the subsequent certificate of disallowance of the N.E.C. upset this division of the partnership's losses by allocating the $22,638 disallowed as a deduction to all of the partners (limited and general) according to their

partnership interests. By so doing the share of the partnership's net loss attributed to each of the limited partners was reduced to less than the capital each had contributed to the partnership. This in turn meant that the share of the partnership's net loss (as redetermined by the N.E.C.) attributed to petitioners was considerably greater than they were entitled to under the partnership agreement. The respondent's determination herein is the result of the reapplication of the loss distribution formula of the partnership agreement to the partnership's reduced net loss (taking into account the determination of the N.E.C.) for 1952. Thus, some of the losses which had previously spilled over into petitioners' accounts as being in excess of the limited partners' capital accounts must now be restored to the limited partners' accounts in the light of the N.E.C.'s allocation. Unless the losses attributed to petitioners are thus reduced in conformity with the partnership agreement, the N.E.C.'s determination results in a tax windfall to petitioners which I am confident the N.E.C. never intended.

Of course, I have no quarrel with the majority opinion to the effect that the N.E.C. determination is binding. Notwithstanding the manner in which the parties may have formulated their contentions, the question whether the N.E.C.'s determination must prevail over that of the Commissioner is a false issue. Certainly, the former is binding. The dispositive issue concerns the *effect* of that determination in the computation of petitioners' tax liability; and that tax liability must be computed under the Internal Revenue Code, at the rates fixed therein, and subject to all other provisions of the revenue laws. One of those provisions requires that a partner's distributive income be determined in accordance with the partnership agreement. And while the N.E.C. determination is conclusive as to the availability of the disallowed deduction to the partnership and the partners, it in no way precludes the distribution of the remaining, allowable net loss among the partners in accordance with the terms of the partnership agreement. Accordingly, after effect is given to the N.E.C. determination, there remains the problem of ascertaining the consequences of that determination.

In this case, one of the consequences is that losses of the enterprise (even after the adjustment required by the N.E.C.) are of such magnitude that when they are allocated among the partners proportionately the losses of the limited partners exceed their capital accounts. Therefore, wholly apart from the deduction disallowed by the N.E.C., the limited partners are entitled to deduct losses equal to their capital accounts, leaving only the remaining losses to be deducted by the general partners. Thus, to the extent that the limited partners are entitled to "draw upon" other losses (previously allocated to the gen-

eral partners) in order to bring them up to the full amount of their capital accounts, the losses available to the general partners must be diminished. The Commissioner's determination in substance, regardless of its phrasing, merely allocated to the general partners the losses properly allocable to them under the partnership agreement *after* the N.E.C.'s disallowance. The allowance of deductions to them for greater losses under the supposed compulsion of a N.E.C. determination, purportedly vindicating the N.E.C. as against the Commissioner, would, I think, come as a great surprise to the N.E.C. No such strange result is required by any statute, regulation, determination, or administrative ruling.

TURNER, BRUCE, and PIERCE, *JJ.*, agree with this dissent.